## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ST. MARKS PLACE HOUSING COMPANY, INC.; <br> ST. MARKS PLACE ASSOCIATES; STELLAR CP LP; <br> and CASTLETON GP LLC, | ) <br> ) <br> ) <br> ) | Case No. 1:08-cv-00193 (RBW) |
| Plaintiffs, | ) <br> ) | |
| - against - | ) <br> ) | |
| UNITED STATES DEPARTMENT OF HOUSING <br> AND URBAN DEVELOPMENT; and ALPHONSO <br> JACKSON, AS SECRETARY OF THE UNITED <br> STATES DEPARTMENT OF HOUSING AND <br> URBAN DEVELOPMENT, | ) <br> ) <br> ) <br> ) <br> ) <br> ) | |
| Defendants. | ) <br> ) | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

David J. Butler (D.C. Bar No. 914473)
Robert W. Piatt III (D.C. Bar No. 502513)
BINGHAM McCUTCHEN LLP
2020 K Street, NW
Washington, DC 20006
Phone:  (202) 373-6000
Fax:     (202) 373-6001
*Attorneys for Plaintiffs*

OF COUNSEL TO PLAINTIFFS:

Stephen B. Meister (pro hac vice application
      pending)
MEISTER SEELIG & FEIN, LLP
2 Grand Central Tower
140 E. 45th Street, 19th Floor
New York, NY 10017
Phone: (212) 655-3500
Fax:     (212) 655-3535

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

FACTS ................................................................................................................... 3

STANDARD OF REVIEW ...................................................................................... 11

ARGUMENT .......................................................................................................... 13

I.     THE LANGUAGE IN THE SENIOR NOTE
PURPORTING TO REQUIRE HUD'S CONSENT TO THE PREPAYMENT OF
THE SENIOR NOTE CONTRAVENES HUD'S EXPRESS REGULATIONS
IN EFFECT IN 1977 AND IS THEREFORE VOID ...................................... 13

       1.     The Applicable HUD Regulations Require that the
Senior Mortgage Be Prepayable Without HUD Consent ..................... 13

       2.     The HUD Regulations in Effect in 1977 Supersede Any
Contrary Language in the Senior Note ................................................ 15

       3.     The Reasoning of the 1995 HUD Opinion is Applicable
to the Section 207 Regulations .......................................................... 16

       4.     There Was No Wavier of the HUD Regulation ................................... 17

II.    THE LANGUAGE OF 24 C.F.R. § 207.14(a) (1977) IS CLEAR AND
UNAMBIGUOUS; THEREFORE, THE SECRETARY'S
INTERPRETATION SHOULD BE AFFORDED NO DEFERENCE ............................ 19

III.   IN ANY EVENT, THE LANGUAGE IN THE HUD INSURED SENIOR
MORTGAGE NOTE'S FOOTNOTE REQUIRING HUD'S CONSENT
TO PREPAYMENT APPLIES ONLY TO CERTAIN PARTIAL
PREPAYMENTS AND NOT TO A PREPAYMENT IN FULL ..................................22

CONCLUSION ...................................................................................................... 25

i

# TABLE OF AUTHORITIES

## Cases Cited

*Auer v. Robbins,*
519 U.S. 452, 117 S.Ct. 905 (1997) ........................................................................ 19

*Browning v. Clinton,*
292 F.3d 235 (D.C. Cir. 2002) .................................................................................. 11

*Chelsea Condominium Unit Owners Assoc. v. 1815 A St. Condominium Group, LLC,*
468 F. Supp.2d 136 (D.D.C. 2007) ............................................................................ 11

*Christensen v. Harris County,*
529 U.S. 576, 120 S.Ct. 1655 (2000) ........................................................................ 19

*Conley v. Gibson,*
335 U.S. 41, 78 S.Ct. 99 (1957) ................................................................................ 11

*Counsel of and for the Blind of Delaware County Valley, Inc. v. Regan,*
709 F.2d 1521 (D.C. Cir. 1983) ................................................................................. 12

*Powell v. Castaneda,*
390 F. Supp.2d 1, 10 (D.D.C. 2005) .......................................................................... 11

*Radack v. U.S. Dept. of Justice,*
402 F. Supp.2d 99 (D.D.C. 2005) .............................................................................. 11

*Shear v. The National Rifle Association of America,*
606 F.2d 1251 *D.C. Cir. 1979) .................................................................................. 3

*Shulman v. Voyou, L.L.C.,*
251 F. Supp.2d 166 (D.D.C. 2003) ............................................................................ 24

*Sierra Club v. Leavitt,*
355 F. Supp.2d 544 (D.D.C. 2005) ...................................................................... 12, 19

*United Mine Workers of Am. Employee Benefit Plans Litig.,*
854 F. Supp. 914 (D.D.C. 1994) ............................................................................... 11

*Warren v. District of Columbia,*
353 F.3d 36 (D.C. Cir. 2004) .................................................................................... 11

## Statutes, Regulations and Treatises Cited

24 C.F.R. Section 200.87................................................................20

24 C.F.R. Part 207 (1977)........................................................1, 13

24 C.F.R. Section 207.14(a) (1977)...........................................*passim*

24 C.F.R. Section 207.32a (1977) .........................................1, 4, 14

24 C.F.R. Section 207.253(a) (1977).................................................5

24 C.F.R. Part 215 (1995)...............................................................15

24 C.F.R. Section 221.524(a) (1995)..........................................15, 18

24 C.F.R. Section 221.524(a) (1977)..............................................16

24 C.F.R. Section 236.30 (1995) ....................................................18

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706...............11-12

Mandamus Act, 28 U.S.C. § 1361 ..................................................12

Fed. R. Civ. P. 12(b)(6) ................................................................11

NHA Section 207, 12 U.S.C. § 1713.................................4, 5, 13, 14, 16

NHA Section 221, 12 U.S.C. § 1715*l* ...............................................16

NHA Section 221(d)(3), 12 U.S.C. § 1715(d)(3) ...........................15, 16

NHA Section 223(f),12 U.S.C. § 1715n.......................................4, 5, 13, 14

NHA Section 250(a), 12 U.S.C. § 1715z-15(a)...............................*passim*

New York State Private Housing Finance Law ("PHFL") Article II .............3, 4

Section 35(2) of the PHFL..............................................................6

Low Income Housing Preservation and Resident
Homeownership Act of 1990 (LIHPRHA).........................................15

Department of Veterans Affairs, Housing and
Urban Development and Independent Agencies Appropriation Act of 1999 ...............14

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ST. MARKS PLACE HOUSING COMPANY, INC.; ST. MARKS PLACE ASSOCIATES; STELLAR CP LP; and CASTLETON GP LLC, <br><br> Plaintiffs, <br><br> - against - <br><br> UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; and ALPHONSO JACKSON, AS SECRETARY OF THE UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, <br><br> Defendants. | Case No. 1:08-cv-00193 (RBW) |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### Preliminary Statement

This action arises from the plaintiffs' attempts to prepay in full a thirty-one year old senior mortgage loan insured by defendant United States Department of Housing and Urban Development ("HUD"). The HUD regulations that were in effect in 1977 when this senior mortgage loan was endorsed by HUD for insurance (specifically, 24 CFR Sections 207.14(a)(1977) and 207.32a(1977))[1] mandated that the only prerequisite to prepayment of the senior mortgage be that the plaintiffs give HUD thirty days' advance written notice of their intention to prepay. HUD's consent to the prepayment of this mortgage loan was not required under these regulations, which, in fact, expressly required just the opposite – that any mortgage loan note endorsed for insurance by HUD

---

[1] A copy of 24 CFR Part 207 (1977) is attached as <u>Exhibit A</u> to the accompanying declaration of plaintiffs' counsel, Stephen B. Meister (the "Meister Decl.").

thereunder "<u>shall</u> contain a provision permitting the mortgagor to prepay the mortgage…." (emphasis added).

Despite providing defendants with the required advance written notice of their intent to prepay the senior mortgage loan, defendants have refused to permit plaintiffs to prepay their thirty-one year old senior mortgage loan without first making substantial payments (not to be credited against the mortgage loan balance) and agreeing to extend, for a substantial period following the prepayment, material limitations on rents with respect to the mortgaged property, purportedly pursuant to Section 250(a) of the National Housing Act, 12 U.S.C. section 1515z-15 ("Section 250(a)").

Section 250(a) establishes statutory conditions for prepayment of mortgage loans on HUD insured multifamily housing projects, but only where HUD's approval for prepayment is required. Defendants contend that Section 250(a) applies to and governs plaintiffs' senior mortgage loan, basing this determination on a footnote contained in the mortgage note which purportedly requires the approval of the Secretary of HUD before the mortgage loan can be prepaid, contrary to the law at the time the note was signed. Thus, defendant HUD has refused to permit the prepayment of the plaintiffs' senior mortgage loan unless plaintiffs agree to several onerous and costly requirements. Defendants have imposed these onerous and costly requirements pursuant to Section 250(a).

Plaintiffs will demonstrate herein that HUD's approval is not required for the prepayment of the senior mortgage, and that Section 250(a) therefore does not apply to the plaintiffs' senior mortgage loan. The inclusion of footnoted language in the senior mortgage note requiring the Secretary's approval for prepayment contravenes the

applicable HUD regulations and thus, under HUD's own rulings and issuances, such language is null and void. Additionally, the senior mortgage note language arguably requiring the Secretary's approval for prepayment, read within the context of the entire senior mortgage note, is revealed as requiring HUD's approval only for certain partial payments as provided in the attachment to the senior mortgage note (and not to a full prepayment, as is now contemplated).

For these reasons, the defendants' motion to dismiss should be denied in its entirety, and the Court should (i) declare and adjudge that the prepayment of the plaintiffs' senior mortgage loan is permissible without HUD's consent; (ii) enjoin HUD from imposing any restrictions or conditions on the prepayment of the senior mortgage loan, other than those customary requirements as to notice and prepayment date contained in the applicable regulations in effect at the time the senior mortgage loan was endorsed for insurance by HUD in 1977; and (iii) compel HUD, by court order in the nature of mandamus, to take any and all action required to withdraw and countermand its prior rejection of plaintiffs' notice of intent to prepay the senior mortgage loan.

### Facts[2]

Plaintiff St. Marks Place Housing Company, Inc. (the "Housing Company"), a limited profit housing company organized under Article II of the Private Housing Finance Law of the State of New York (the "PHFL"), is the nominal owner of record of a multi-family housing complex located in Staten Island, New York known as Castleton Park Apartments (the "Apartment Building"). Housing Company holds title to the Apartment

---

[2]      The facts described below are taken from the complaint in this action (the "Compl."). The law is well-settled that for purposes of ruling on a motion to dismiss, the factual allegations contained in a complaint are to be presumed true and liberally construed in favor of the plaintiff. *See, e.g., Shear v. The National Rifle Association of America*, 606 F.2d 1251, 1253 *D.C. Cir. 1979).

Building for the benefit of plaintiff St. Marks Associates ("St. Marks Associates"), a New York limited partnership, the beneficial owner of the Apartment Building. See Compl., ¶'s 4-5.

Housing Company was formed for the purpose of acquiring, and now owns, record title to the real property upon which the Apartment Building is situated. Compl. ¶ 10. Article II of the PHFL is commonly known in New York as the "Mitchell-Lama Law," and multi-family apartment buildings, such as the Apartment Building, organized pursuant thereto are regarded as being operated under the "Mitchell-Lama Program" (unless and until the owner of any such apartment building withdraws from and exits the Mitchell Lama Program). Id.

The Apartment Building was originally financed with a non-insured mortgage loan dated January 30, 1974 in the original amount of $19,715,000 (later increased to $20,990,000) made by the New York State Housing Finance Agency ("NYSHFA") to plaintiff Housing Company. Compl. ¶ 16. This mortgage loan was subsidized under Section 236 of the NHA but was not insured by HUD, and as such is commonly referred to as a "non-insured, Section 236 assisted loan." Id. at ¶ 17.

The Apartment Building was one of the portfolio of New York State and New York City financed non-insured, Section 236-assisted buildings originally financed in the early 1970's, and then subsequently refinanced in the late 1970's under the authority of Section 207 of the NHA pursuant to Section 223(f) of the NHA and 24 CFR section 207.32a(k)(1977). Specifically, in 1977, the Apartment Building's existing non-insured, Section 236-assisted mortgage debt was bifurcated into a HUD-insured, Section 236-assisted senior mortgage loan (the "Senior Mortgage") in the original amount of

$17,629,100, insured under Section 207 of the NHA pursuant to Section 223(f) of the NHA, and a non-insured, Section 236-assisted subordinate mortgage loan (the "Non-Insured Subordinate Mortgage")[3] in the original principal amount of $3,360,900, each dated October 13, 1977. Compl. ¶'s 18-19.

On the first page of the mortgage note secured by the Senior Mortgage (the "Senior Note"), there appears the following language:

> "Privilege is reserved to pay the debt in whole or in an amount equal to one or more monthly payments on principal next due, on the first day of any month prior to maturity at least thirty (30) days' prior written notice to the holder. * * If this debt is paid in full prior to maturity and while insured under the National Housing Act, all parties liable for payment of this debt hereby agree to be jointly and severally bound to pay to the holder hereof any adjusted premium charge required by the applicable Regulations. See 'Attachment A,' Paragraph 2 incorporated herein by reference and made a part hereof."

At the bottom of the first page of the Senior Note, the following footnote was inserted:

> "**Subject to the prior approval of the Secretary of Housing and Urban Development."

A true and correct copy of the Senior Note is attached to the accompanying Meister Decl. as Exhibit B.[4]

---

[3]     It is not disputed that the Non-Insured Subordinate Mortgage is not prepayable without the consent of HUD until the "HUD Release Date" (i.e., the earlier to occur of the date on which the Senior Mortgage is prepaid or the date on which the Senior Mortgage is no longer held or insured by HUD), whereupon the Non-Insured Subordinate Mortgage becomes prepayable without the consent of HUD. Therefore, the plaintiffs intend to prepay the Non-Insured Subordinate Mortgage immediately following the prepayment of the Senior Mortgage.

[4]     The requirement in the Senior Note for payment of "any adjusted premium charge required by the applicable Regulations," is based on section 207.253 of HUD's regulations in effect until April 29, 1972. Those regulations generally required the payment of a premium to HUD equal to two percent of the original mortgage amount if prepayment occurred within the first five years after initial endorsement, or one percent of the original mortgage amount if the prepayment occurred after the first five years. This HUD regulation was rescinded in 1972, and the regulation in effect in 1977 when the Senior Mortgage was endorsed for insurance by HUD, 24 CFR section 207.253(a) (1977), states in part that "[n]o adjusted premium charge shall be due the Commissioner on account of [mortgage prepayment]." Nonetheless, the

**Proposed Sale to the Stellar Plaintiffs**

On or about May 31, 2006, the owners of stock of plaintiff Housing Company, and plaintiff St. Marks Associates, jointly as sellers (together, the "St. Marks Plaintiffs"), and plaintiffs Stellar CP LP ("Stellar CP") and Stellar Castleton GP LLC ("Stellar Castleton," and together with Stellar CP, collectively the "Stellar Plaintiffs"),[5] jointly as buyers, entered into a contract pursuant to which the St. Marks Plaintiffs agreed to sell and the Stellar Plaintiffs agreed to buy the beneficial interest in the Apartment Building owned by plaintiff St. Marks Associates and all of the outstanding stock of plaintiff Housing Company (the "Contract"). Compl. ¶ 11.

Under Section 35(2) of the PHFL, the St. Marks Plaintiffs have the absolute and unqualified statutory right to withdraw the Apartment Building from the Mitchell-Lama Program at any time after the twentieth (20th) anniversary of the date the certificate of occupancy was issued for the Apartment Building. The certificate of occupancy for the Apartment Building was issued more than twenty (20) years ago, and thus, the St. Marks Plaintiffs now have the absolute statutory right to withdraw from the Mitchell-Lama Program. Compl. ¶'s 12-13.

Pursuant to the Contract, on June 28, 2006, the St. Marks Plaintiffs, with the advance knowledge and consent of the Stellar Plaintiffs, initiated the process of withdrawing the Apartment Building from the Mitchell-Lama Program by filing a

---

HUD form of mortgage note used after 1972 with respect to the Senior Mortgage at issue here included the printed language requiring the payment of any adjusted premium charge.

[5]     While paragraph 7 of the plaintiffs' complaint herein correctly identifies plaintiff Stellar Castleton as "Stellar Castleton GP LLC," the caption of the plaintiffs' complaint herein contains a typographical error and incorrectly identifies plaintiff Stellar Castleton as "Castleton GP LLC" (rather than Stellar Castleton GP LLC). Inasmuch as this inadvertent typographical error relates solely to a plaintiff and not a defendant, such that there is no risk that a defendant misapprehended it was being sued, the error is entirely harmless and ministerial in nature. Accordingly, plaintiffs hereby respectfully request that the Court order that the caption in this action be amended to correctly identify Stellar Castleton.

"Notice of Intent to Dissolve" plaintiff Housing Company with the New York State Division of Housing and Community Renewal, the New York State agency charged with supervisory jurisdiction over the Apartment Building.  Upon the Apartment Building's exiting the Mitchell-Lama Program, the limited profit housing company owning the Apartment Building, here plaintiff Housing Company, is required to be dissolved or reconstituted as a business corporation not subject to the provisions of the Mitchell-Lama Law.  The Mitchell-Lama law requires that upon the Apartment Building's withdrawal from the Mitchell-Lama Program, the Apartment Building's government subsidized or assisted mortgages be paid off.  Compl. ¶'s 14-15.

By letters to HUD dated December 1, 2006, March 30, 2007, July 31, 2007, November 30, 2007, and March 28, 2008, plaintiffs notified HUD of their intention to prepay the Senior Note.  Additionally, by letter dated April 17, 2007, plaintiffs' counsel, at the request of HUD's New York Regional Office, provided to HUD a written summary, with relevant citations, of the reasons why HUD approval is not required for the prepayment of the Senior Note and therefore why Section 250(a) of the NHA is inapplicable to proposed prepayment.  Compl. ¶'s 32-33.

Thereafter, in or about June 2007, HUD's Office of General Counsel advised HUD's Assistant Secretary for Housing/Federal Housing Commissioner (the "Assistant Secretary") that it agreed with plaintiffs' counsel's conclusion that HUD's approval is not required for prepayment of the Senior Note and that Section 250(a) of the NHA is therefore inapplicable to the prepayment of the Senior Note.  Subsequently, on or about September 25, 2007, plaintiffs' counsel and certain of their principals met with representatives of defendant HUD in Washington, D.C., including HUD's General

Counsel and other attorneys in HUD's Office of General Counsel, to discuss the plaintiffs' plan to prepay the Senior Note and the Non-Insured Subordinate Mortgage. At this meeting, plaintiffs' counsel once again outlined for HUD the reasons why HUD's approval is not required for prepayment of the Senior Note and therefore why Section 250(a) of the NHA is inapplicable to the prepayment. Compl. ¶'s 34-35. Following this meeting, in or about October 2007, HUD's Office of General Counsel once again advised the Assistant Secretary's office of its conclusion that HUD's approval is not required for prepayment of the Senior Note and that Section 250(a) of the NHA is therefore inapplicable to the proposed prepayment. See October 11, 2007 memorandum from Millicent B. Potts, HUD's Assistant General Counsel for Multifamily Mortgage Insurance, to Beverly J. Miller, Director, Office of Asset Management (the "Office of General Counsel Memo"), a copy of which is attached to the accompanying Meister Decl. as Exhibit C.

**Senator Schumer Gets Involved**

However, in or about October 2007, sometime shortly after HUD's Office of General Counsel advised the Assistant Secretary's office that HUD's approval was not required for the prepayment of the Senior Mortgage and that Section 250(a) of the NHA, therefore did not apply to the Senior Mortgage, then-HUD Secretary Alphonso Jackson met with Senator Charles Schumer (D-NY). Compl. ¶ 37. Senator Schumer, at that time, convinced then-Secretary Jackson to advise the relevant parties that HUD's approval was required for the prepayment of the Senior Mortgage and that Section 250(a) of the NHA was therefore applicable to the Senior Mortgage. See the December 20, 2007 Press

Release from Senator's Schumer's office, a copy of which is attached to the Meister Decl. as <u>Exhibit D</u>.

Thereafter, by letter dated November 1, 2007, plaintiffs' counsel notified Capmark Finance, Inc. ("Capmark"), the current holder of the Senior Note, of the St. Marks Plaintiffs' intention to prepay the Senior Note in full on or about February 1, 2008, and requested that Capmark obtain HUD's execution of Form HUD-9807, Insurance Termination Request for Multifamily Mortgages (HUD requires that the insured mortgagee submit this form to HUD for processing prior to the prepayment of any HUD-insured multifamily mortgage, regardless of whether the HUD-insured mortgage loan requires HUD's approval for prepayment).  Compl. ¶ 38.

In response to plaintiffs' letters notifying defendant HUD of plaintiffs' intention to prepay in full the Senior Note, and notwithstanding the advice of HUD's Office of General Counsel of the inapplicability of Section 250(a) of the NHA to the Senior Note, HUD informed plaintiffs by letter dated December 20, 2007, that (a) due to the prepayment restriction contained in the Senior Note, the consent of HUD to the prepayment of the Senior Note was required; (b) the prepayment of the Senior Note was subject to the restrictions of Section 250(a) of the NHA, and (c) HUD was denying plaintiffs' request to prepay the Senior Note unless plaintiffs agree to expend a minimum of $15,000 per unit in repairs/rehabilitation costs or replace two or more major building components, and to execute a rental use agreement, to be recorded in first lien position on the Apartment Building until November 1, 2017, severely limiting the rents that can be charged at the Apartment Building.  By notice dated December 20, 2007, defendant HUD

also advised Capmark that the prepayment of the Senior Note sought by plaintiffs was "not approved" by HUD.  Compl. ¶'s 39-40.

Defendant HUD based its denial of plaintiffs' request to repay the Senior Note on the language in the Senior Note purporting to give HUD the right to approve prepayment thereof.  However, as HUD's own Office of General Counsel concluded, such language contravenes the express requirements of the applicable regulations in effect at the time the Senior Mortgage was endorsed for insurance by HUD, and that therefore such language is void *ab initio* and of no force or effect.

By reason of the foregoing, HUD has acted in an arbitrary and capricious manner, in a manner infected with error of law and in manner constituting an abuse of discretion, in denying plaintiffs' request to prepay the Senior Note due to HUD's erroneous determination that Section 250(a) of the NHA applies to plaintiffs' prepayment of the Senior Note and that HUD's consent to such prepayment is required.  Thus, plaintiffs are entitled to a declaratory judgment that the Senior Mortgage may be prepaid without HUD's consent on thirty days' notice, that any language to the contrary contained in the Senior Note is void *ab initio* and that therefore Section 250(a) does not apply to or govern the Senior Mortgage.  For all of these reasons, and those set forth below, the defendants' motion to dismiss should be denied in its entirety, and the relief requested in plaintiffs' complaint should be granted in its entirety forthwith.

## STANDARD OF REVIEW

A motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a complaint. *See Powell v. Castaneda*, 390 F. Supp.2d 1, 10 (D.D.C. 2005), *citing Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In order to survive a motion to dismiss for failure to state a claim the plaintiff's complaint must simply provide a short and plain statement of the claim "that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *See Radack v. U.S. Dept. of Justice*, 402 F. Supp.2d 99, 103 (D.D.C. 2005), *citing Conley v. Gibson*, 335 U.S. 41, 47, 78 S.Ct. 99 (1957). It is not necessary for a plaintiff's complaint to contain all elements of his prima facie case, nor that it "plead law or match facts to every element of a legal theory." *See Powell*, 390 F. Supp.2d at 10 (citations omitted).

"Accordingly, 'the accepted rule in every type of case' is that a court should not dismiss a complaint for failure to state a claim unless the defendant can show beyond doubt that the plaintiff can prove no set of facts in support of her claim that would entitle her to relief. *Id.*, *citing Warren v. District of Columbia*, 353 F.3d 36, 37 (D.C. Cir. 2004); *Chelsea Condominium Unit Owners Assoc. v. 1815 A St. Condominium Group, LLC*, 468 F. Supp.2d 136, 145 (D.D.C. 2007). The court, in evaluating the merits of the motion, "must construe the complaint in the light most favorable to plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations." *Radack*, 402 F. Supp.2d at 104, *citing In re United Mine Workers of Am. Employee Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994).

Defendants' motion to dismiss contends that plaintiffs have failed to state a claim in their complaint herein under the Administrative Procedure Act ("APA"), 5 U.S.C. §§

701-706.  According to the defendants, under the APA, a court reviews a final agency

action (such as HUD's determination here to apply Section 250(a)'s prepayment

restrictions to the Senior Note) under an "arbitrary and capricious" standard.  See

Defendants' Memorandum in Support of Motion to Dismiss ("Defendants' Mem.") at 12

(citations omitted).  While deference should be given to an agency's interpretation of its

own regulation, no such deference should be given where, as here, the regulation in

question is clear and unambiguous on its face.  See Sierra Club v. Leavitt, 355 F. Supp.2d

544, 552 (D.D.C. 2005).  See also discussion supra, at 19-22.

As is demonstrated below, the HUD regulation at issue here, i.e., 24 CFR Section

207.14(a), as in effect in 1997, is clear and unambiguous – it gives a mortgagor the

unfettered right to prepay a HUD insured mortgage on any interest payment date as long

as thirty days notice is given to the mortgagee in writing.  No other restrictions are

contained in the HUD regulation which might encumber this prepayment right.  In

consequence, the HUD Secretary's decision to apply Section 250(a) to the Senior Note,

and thus restrict the prepayability of the Senior Note, has no basis, and was made in an

arbitrary and capricious manner by reason of which plaintiffs have properly alleged a

claim under the APA pursuant to which the Secretary's wrongful determination should be

declared null and void.[6]

---

[6]      Defendants' contentions that the plaintiffs have no claim under the Mandamus Act, 28 U.S.C. §
1361, likewise has no merit.  As is demonstrated in plaintiffs' complaint, and herein, it is readily apparent
that plaintiffs have met all three requirements for mandamus relief, i.e., (1) that they have a clear right to
such relief, (2) that the defendants had a clear duty to act, and (3) that there are no other adequate remedies
at law.  See Counsel of and for the Blind of Delaware County Valley, Inc. v. Regan, 709 F.2d 1521, 1533
(D.C. Cir. 1983).  Here, the applicable HUD regulation in effect in 1977, namely Section 201.14(a), gives
the plaintiffs the clear right to prepay the Senior Mortgage as long as they provide thirty days written notice
to the mortgagee, which they have done.  No other conditions or restrictions on such prepayment exist.
Thus, HUD has a clear duty to permit the prepayment of the mortgage note without imposing additional
obligations on plaintiffs.  Instead, the HUD Secretary has arbitrarily and capriciously determined that HUD
may impose additional restrictions on such prepayment under Section 250(a).  Since there are no other

## ARGUMENT

### I.

### THE LANGUAGE IN THE SENIOR NOTE PURPORTING TO REQUIRE HUD'S CONSENT TO THE PREPAYMENT OF THE SENIOR NOTE CONTRAVENES HUD'S EXPRESS REGULATIONS IN EFFECT IN 1977 AND IS THEREFORE VOID

HUD's determination that its consent is required for the prepayment of the Senior Note, and that such prepayment is therefore subject to Section 250(a) of the NHA, is without merit. Such determination has no statutory or regulatory basis and in fact contravenes the express requirements of the applicable HUD regulations and HUD's own rulings and issuances and therefore is void *ab initio*.

**1.      The Applicable HUD Regulations Require that the Senior Mortgage Be Prepayable Without HUD Consent**

The Senior Note was endorsed for insurance under Section 207 of the NHA pursuant to Section 223(f) of the NHA, and HUD's implementing regulations thereunder. Neither statute, as in effect at the time the Senior Note was endorsed by HUD for insurance, required HUD approval for prepayment of the plaintiffs' mortgage loan by HUD. In this regard, HUD's implementing regulations at 24 CFR Part 207, as in effect in 1977, expressly required that mortgage loans under Sections 207 of the NHA be freely prepayable. Specifically, 24 CFR Section 207.14(a), as in effect in 1977, provided as follows:

> "(a)    *Prepayment privilege*. The mortgage **shall** contain a provision permitting the mortgagor to prepay the mortgage in whole or in part upon any interest payment date after giving the mortgagee 30 days' notice in writing in advance of its intention to so prepay." (emphasis added)."

---

adequate remedies at law to rectify the HUD Secretary's erroneous determination, a mandamus action is appropriate here.

HUD's regulation at 24 CFR 207.32a, as in effect in 1977, which establish additional requirements for Section 207 mortgages that are insured pursuant to Section 223(f), do not provide any additional requirements regarding prepayment of the mortgage. There were in fact no statutes or HUD regulations in effect in 1977 which required or permitted a forty (40) year prepayment prohibition to be placed on the Senior Mortgage.

The inclusion of a requirement for HUD approval of prepayment is inconsistent with and in fact contravenes the regulatory language quoted above. If the mortgagor of a Section 207 mortgage loan must seek HUD's approval for prepayment of that loan, and HUD refuses to grant such approval, then the result is that the mortgagor has been denied the right to "prepay the mortgage in whole or in part... after giving the mortgagee 30 days' notice in writing in advance of its intention to so prepay." The only valid requirements for the prepayment of the Senior Note are that the borrower give the required thirty days' notice of its intent to make such prepayment and that the prepayment occur on an interest payment date. Plaintiffs have given such notice and thus are entitled to prepay Senior Note.

Based on the above-referenced regulations in effect at the time the Senior Mortgage was endorsed for insurance in 1977, the typed-in footnote language in the Senior Note, to the extent it is determined to require HUD's approval for prepayment at any time during the forty (40) year term of the Senior Mortgage, is directly contrary to and inconsistent with the express language contained in HUD's regulations in effect in 1977, as quoted above, which mandate that the Senior Note entitle the owner to prepay the mortgage upon thirty (30) days' prior written notice on any interest payment date.[7]

---

[7]     Plaintiffs do not dispute that if Section 219 of the Department of Veterans Affairs, Housing and Urban Development and Independent Agencies Appropriation Act of 1999 is deemed applicable to the

**2.    The HUD Regulations in Effect in 1977 Supersede Any
        Contrary Language in the Senior Note**

It is well-established in HUD's own legal rulings and issuances that where a HUD

mortgage note contains prepayment prohibition language (including language requiring

HUD's consent to a prepayment) that conflicts with applicable HUD regulations, the

regulations supersede the conflicting mortgage note language.  See, e.g., 1995 Opinion

issued by HUD's Associate General Counsel for Insured Housing, Legal Op. CIM-0111

(May 1, 1995) (the "1995 HUD Opinion").  A copy of the 1995 HUD Opinion is attached

to the accompanying Meister Decl. as Exhibit E.  The 1995 HUD Opinion addresses a

mortgage note insured under Section 221(d)(3) of the NHA which contained language

prohibiting prepayment for the full term of the mortgage.  Because the mortgagor was a

limited dividend entity not receiving rent supplement assistance (a rent subsidy program

authorized under 24 CFR Part 215 as in effect at that time), the applicable HUD

regulation permitted prepayment without HUD's consent twenty years after final

endorsement of the mortgage for insurance.  24 CFR section 221.524(a)(2) (1995).  The

1995 HUD Opinion recognized that the regulations "supersede contrary language in the

mortgage note," and thus the owner would be entitled to prepay the mortgage without

HUD's consent upon the expiration of twenty years after final endorsement.  In support

of this conclusion, the 1995 HUD Opinion cites the following preamble language to

HUD's proposed rule implementing the Low Income Housing Preservation and Resident

Homeownership Act of 1990 (LIHPRHA):

---

Senior Note, then a notice (commonly called a "Wellstone Notice," named after the late Senator Paul
Wellstone) must be served upon the relevant parties specifying a prepayment window (for both the Senior
Mortgage and the Non-Insured Subordinate Mortgage) of between 150 and 270 days after the service of
such notice.  A Wellstone Notice was duly served on all appropriate parties with respect to the Apartment
Building together with the required updates thereto.

> "... if the applicable program regulations...allow prepayment at the expiration of 20 years after final endorsement, but the mortgage note prohibits prepayment without HUD's consent for the full term of the mortgage, **HUD would construe the regulation as superseding the prepayment prohibition in the mortgage note**."

See 1995 HUD Opinion at 3, citing 56 Fed. Reg. 20262, 20267 (May 2, 1991) (Emphasis added).

### 3.    The Reasoning of the 1995 HUD Opinion is Applicable to the Section 207 Regulations

Defendants attempt to distinguish the 1995 HUD Opinion by noting that the applicable regulation addressed in that Opinion — 24 CFR section 221.524(a)(2)(1977) — included the phrase "without the Secretary's consent," whereas the provision upon which Plaintiffs rely — 24 CFR section 207.14(a)(1977) — does not contain this phrase. Defendants' contention in this regard has no merit.

As defendants themselves pointed out, section 221.524 was structured to distinguish between those circumstances in which prepayment of Section 221 mortgages were permitted "[w]ithout prior [HUD] consent" and those circumstances in which prepayment of Section 221 mortgages were permitted "[w]ith prior [HUD] consent." See Defendants' Mem. at 16, citing 24 C.F.R. § 221.524(a) (1977). Since there were situations where HUD's consent to prepayment of Section 221(d)(3) mortgage loans was required, and other situations where HUD's consent to prepayment of such mortgage loans was not required, the prepayment regulation for Section 221 mortgages had to be worded in a way that distinguished between those two situations. By contrast, the design of the Section 207 program was that HUD's consent was <u>never</u> required for prepayment,

so there was no need in the Section 207 regulation to include language that makes such a distinction.

HUD's argument simply does not make sense. How can a regulation which requires that the borrower be entitled to prepay his loan on thirty days notice, be said to have been complied with if such borrower must first ask for HUD's permission and such permission is thereafter denied? Clearly, if such permission is required and denied, then the borrower may not in fact prepay "on thirty days notice." The regulation requires that the owner be entitled to prepay the mortgage upon thirty days' notice and that such prepayment occur on an interest payment date. Plaintiffs have given such notice and thus should be permitted to prepay the mortgage note. Section 250(a) has no application.

**4.    There Was No Waiver of the HUD Regulation**

HUD has not proffered any administrative basis for the inclusion in the Senior Note of a requirement for HUD's consent to prepayment, and has not presented any evidence that HUD expressly or formally waived the requirements of 24 CFR Section 207.14(a) (1977) of the NHA to allow the inclusion of a provision requiring the consent of HUD to prepayment of the Senior Note. The parties who prepared the Senior Note did not have the authority to make changes in the Senior Note that were inconsistent with, let alone contradictory to, the HUD regulations in effect at the time, and therefore, could not impose a forty (40) year long prepayment prohibition – by imposing the requirement for HUD consent to a prepayment of the Senior Note – when the mortgagor's right to prepayment without HUD consent was a required term under the regulations in effect at the time the Senior Mortgage was endorsed for insurance by HUD.[8]

---

[8]    Additionally, the defendants' provide no support whatsoever for their contention that the insertion of the prepayment language in the Senior Note footnote "may have been initiated by the Secretary." See

The defendants' contention that the parties to the Senior Note could voluntarily agree to the insertion of the footnote restricting prepayment because Section 200.14(a) did not prohibit them from doing so (Defendants' Mem. at 17-18), ignores the ruling contained in the May 1, 1995 HUD Opinion, in which it was held that HUD's regulations supersede conflicting mortgage note language. The 1995 HUD Opinion necessarily rejected the notion that the presumed intent of the parties should be given effect in the face of conflicting regulatory language. See Meister Decl. Exhibit E.

Also, defendants argue that the 1996 HUD regulation permits HUD to "adjust" the prepayment privilege contained in the regulation "in any particular case." Defendants' Mem. at 16. Thus, according to defendants, the 1996 regulation gives HUD the right to override the prepayment privilege contained in the regulation in certain cases. While plaintiffs do not believe that the 1996 HUD regulation should be used in interpreting the 1977 HUD regulation, it is significant to point out that, despite the defendants' representations in their motion papers, the phrase "in any particular case" is not contained in the 1996 regulation. There is nothing contained in the 1996 HUD regulation that would justify or authorize a case by case use of prepayment prohibitions. In fact, where HUD has imposed prepayment prohibitions, it has done so through formal regulations. See, e.g., 24 C.F.R. sections 221.524 (1995) and 236.30 (1995).

---

Defendants' Mem. at 17. It is incumbent upon HUD to produce evidence to such effect, absent which such assertion must be rejected by the Court.

**II.**

**THE LANGUAGE OF 24 C.F.R. § 207.14(a) (1977) IS CLEAR AND UNAMBIGUOUS; THEREFORE, THE SECRETARY'S INTERPRETATION SHOULD BE AFFORDED NO DEFERENCE**

Defendants contend that the 1977 version of Section 207.14(a) is ambiguous on its face, and, therefore, the Secretary's decision to apply Section 250(a) based on the inclusion of the footnote in the Senior Note was reasonable and should be afforded "substantial deference."    See Defendants' Mem. at 18.    However, as has been demonstrated above, the language of section 207.14(a) is clear and unambiguous - it expressly requires that the mortgage note contain language permitting the mortgagor to prepay the mortgage upon thirty days' written notice, and thus no deference is owed to the Secretary's interpretation of the regulation.

As pointed out by the defendants, courts generally review an agency's interpretation of its own regulations with deference. *See* Defendants' Mem. at 18, *citing Auer v. Robbins*, 519 U.S. 452, 117 S.Ct. 905 (1997). However, as the Supreme Court pointed out in *Christensen v. Harris County*, 529 U.S. 576, 588, 120 S.Ct. 1655, 1663 (2000)

> "...*Auer* deference is warranted only when the language of the regulation is ambiguous. The regulation in this case, however, is not ambiguous — it is plainly permissive. To defer to the agency's position would be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation. Because the regulation is not ambiguous on the issue of compelled compensatory time, *Auer* deference is unwarranted."

Thus, where the language of a regulation is unambiguous, the court owes no deference to the agency's interpretation of the regulation. *See Sierra Club v. Leavitt*, 355 F. Supp.2d 544, 552 (D.D.C. 2005).

Here, the language of the regulation in question is unambiguous. Specifically, 24 CFR Section 207.14(a), as in effect in 1977, provided as follows:

> "(a)    *Prepayment privilege*. <u>The mortgage **shall** contain a provision permitting the mortgagor to prepay the mortgage</u> in whole or in part upon any interest payment date after giving the mortgagee 30 days' notice in writing in advance of its intention to so prepay." (<u>emphasis added</u>)."

Thus, in order to comply with the regulation, the Senior Note was required to contain a provision permitting the mortgagor to prepay the mortgage. The only restrictions on this required prepayment right was that the mortgagor provide the mortgagee with thirty days' written notice of its intention to so prepay and that the prepayment occur on an interest payment date. The regulation could not be any clearer.

Defendants contention, that the current version of the regulation (24 C.F.R. § 200.87) somehow supports its position that Section 250(a) applies here, is groundless. <u>See</u> Defendants' Mem. at 16-17. The language contained in the 1977 version of the HUD regulation (section 207.14(a)), is clear and unambiguous; there is therefore no reason to look to the current version of the HUD's prepayment regulation (section 200.87) to interpret the 1977 regulation.

Defendants' claim that the footnote requiring the Secretary's consent to prepayment of the Senior Note creates an ambiguity, as it conflicts with the regulation permitting prepayment, and thus, the Court must give deference to the Secretary's decision that Section 250(a) applies. This argument is circular and without merit. The footnote creates no ambiguity at all <u>in the regulation</u>; at most it creates an inconsistency between the regulation and the Senior Note (which, as HUD's own rulings have held, must be resolved in favor of the regulation). Of course, the Court owes no deference at

all to the Secretary's interpretation of the Senior Note. That task is soundly within the Court's de novo purview.

Thus, the requirement of Secretary's consent (to the extent) contained in the Senior Note is simply void and of no effect. As stated above, pursuant to well-established HUD precedent, where language contained in a mortgage note and in HUD's regulations contradict one another, the regulations "supersede contrary language in the mortgage note." See supra at 13-18. Since the language in the Senior Note's footnote clearly contradicts the language in section 207.14(a), as in effect in 1977, if the footnote were to be given effect, then the Senior Note would not be in compliance with the applicable HUD regulation. Therefore, the contradictory language (purportedly) requiring HUD's consent to the prepayment of the Senior Note is superseded, such language is void and of no effect, and therefore the Senior Note is not subject to Section 250(a).

Not only is the language of the HUD regulation here unambiguous, HUD's present contention that Section 250(a) should apply expressly contradicts the formal legal interpretation made by HUD's Office of General Counsel in the Office of General Counsel Memo, which states in relevant part as follows:

> "This legal opinion is a supplement to the previous Castleton Park (the Project) legal opinion distributed to your office on June 12, 2007, and will provide further explanation as to why our office maintains the position that Section 250 of the National Housing Act (the Act) ... [is] not applicable to the prepayment restriction found in the HUD-insured mortgage note."

*   *   *

> "as we stated in our June 12 memorandum, since there were no HUD statutes, regulations or administrative

requirements which required that a 40-year prepayment restriction be placed in the HUD Senior Mortgage, we think that the prepayment restriction was a result of tax-exempt bond financing associated with this loan where the prepayment restriction was specifically negotiated and contractually agreed to by the parties to the note."

\*       \*       \*

"The parties in this case did not have the authority to make changes to the HUD note that were inconsistent with the regulations in effect at the time, nor did they have the authority to go beyond what the regulations set forth. In other words, the parties could not impose a HUD requirement for consent to a prepayment of the mortgage when HUD's consent to prepay was not required by the statutes, regulations, or administrative requirements in effect at the time the note was endorsed for mortgage insurance.

See Office of General Counsel Memo, Meister Decl. Exhibit C. Thus, if any deference should be given here, it should be given to this legal opinion issued by HUD's Office of General Counsel, and not to the Secretary's "interpretation" of an unambiguous regulation.

## III.

### IN ANY EVENT, THE LANGUAGE IN THE HUD INSURED SENIOR MORTGAGE NOTE'S FOOTNOTE REQUIRING HUD'S CONSENT TO PREPAYMENT APPLIES ONLY TO CERTAIN PARTIAL PREPAYMENTS AND NOT TO A PREPAYMENT IN FULL

Even if the footnote in the Senior Note requiring HUD's consent to prepayment were to be given effect here (which, as discussed above, it should not), such restriction should not hinder the plaintiffs' right to prepay the Senior Mortgage in full at this time. The language in the footnote to the Senior Note purporting to require HUD's approval for prepayment follows a sentence concerning a prepayment of the "debt in whole or in an amount equal to one or more payments on principal next due." See Senior Note, Meister

Decl. <u>Exhibit B</u>.  Therefore the question immediately arises whether the footnote was intended to modify only the latter language concerning partial prepayments, or both partial prepayments and the earlier language permitting a prepayment of the "debt in whole."

The footnoted paragraph of the Senior Note also contains a typed-in cross-reference to Attachment A, Paragraph 2 of the Senior Note.   Upon examination of the language in the footnote in the broader context of the entire Senior Note, including Attachment A, it is clear that the footnote was intended to modify just partial prepayments of the Senior Mortgage, not both partial prepayments and prepayments in full.

Paragraph 1 of Attachment A first sets forth the scheduled amortization of the loan, maturity date, application of payments to principal and interest, and late charges. It then provides that if the mortgagor fails to achieve "certain rental increases" within the first eighteen months following HUD endorsement, and a one time special prepayment is then made (<u>i.e.</u>, at the conclusion of the eighteen month period following HUD's endorsement) "in an amount to be determined by [HUD]" (presumably based on HUD's determination of the debt service level that can be supported by the rents actually achieved at the conclusion of such eighteen month period), but in no event to exceed $2,557,700.00, then the reduced loan amount shall be reamortized over the remaining term of the mortgage, pursuant to a schedule to be determined by HUD.  <u>Id</u>.

Paragraph 2 of Attachment A then goes on to provide what happens in the case of a prepayment in excess of $2,557,700.  <u>Id</u>.  In that case, a prepayment penalty of 3% of the excess prepayment is owed, which decreases at the rate of $1/8^{th}$ of 1% a year, <u>i.e.</u>

there is no prepayment penalty after year 24.   Unlike paragraph 1, the prepayment provision contained in paragraph 2 does not require HUD's consent, but rather states that the prepayment may be made simply on thirty days' notice on an interest payment date, consistent with HUD regulation section 207.14(a).

Reading all three clauses together, the Senior Note prepayment language can only be construed (a) to require HUD's consent to a penalty free one-time special partial prepayment in a sum (not exceeding $2,557,700) to be determined by HUD based on rents actually achieved within eighteen months after the loan was endorsed by HUD, but (b) not to require HUD's consent to a prepayment in excess of that amount.   This interpretation is supported by the fact that paragraph 2 of Attachment A not only fails to require HUD consent for prepayment but affirmatively states that prepayment may be made "on any interest payment date upon 30 days' prior written notice to the holder thereof…"   This reading is consistent with the general principle of contract interpretation that potentially inconsistent provisions should be construed in a manner which reconciles such provisions or minimizes the degree of conflict, if and to the extent possible.   *See, e.g., Shulman v. Voyou*, L.L.C., 251 F. Supp.2d 166, 169 (D.D.C. 2003) (stating the "basic tenet of contract law where two seemingly conflicting contract provisions exist within a contract, it is the province and duty of the court to find harmony between then and to reconcile them if possible").

Here, we are dealing with a prepayment in whole (and not a partial prepayment) thirty-one years after the loan was endorsed by HUD.   Put in context, it is thus clear that the Senior Note does not even purport to require HUD's consent to a prepayment in full at this time, roughly thirty-one years after the loan was made.

**Conclusion**

For all of the foregoing reasons, it is respectfully requested that the defendants' motion to dismiss be denied in all respects, and that the plaintiffs be awarded all such other and further relief as the Court deems just and proper.


**Oral Hearing Requested**

Pursuant to Local Civil Rule 7(f), Plaintiffs hereby request an oral hearing on this Motion.


Dated: May 5, 2008

/s/ David J. Butler
David J. Butler (D.C. Bar No. 914473)
Robert W. Piatt III (D.C. Bar No. 502513)
BINGHAM MCCUTCHEN LLP
2020 K Street, NW
Washington, DC 20006
Phone:  (202) 373-6000
Fax:    (202) 373-6001
*Attorneys for Plaintiffs*

OF COUNSEL TO PLAINTIFFS:

Stephen B. Meister (pro hac vice application
    pending)
MEISTER SEELIG & FEIN, LLP
2 Grand Central Tower
140 E. 45th Street, 19th Floor
New York, NY 10017
Phone: (212) 655-3500
Fax:    (212) 655-3535

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ST. MARKS PLACE HOUSING COMPANY, INC.;<br>ST. MARKS PLACE ASSOCIATES; STELLAR CP LP;<br>and CASTLETON GP LLC, | )<br>)<br>) | Case No. 1:08-cv-00193 (RBW) |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| - against - | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF HOUSING<br>AND URBAN DEVELOPMENT; and ALPHONSO<br>JACKSON, AS SECRETARY OF THE UNITED<br>STATES DEPARTMENT OF HOUSING AND<br>URBAN DEVELOPMENT, | )<br>)<br>)<br>)<br>) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF STEPHEN B. MEISTER IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

STEPHEN B. MEISTER, under penalties of perjury, declares as follows:

1.      I am a partner in the law firm of Meister, Seelig & Fein, LLP, of counsel attorneys for the Plaintiffs in the above-captioned action.  As such, I am fully familiar with the facts and circumstances set forth herein.  I submit this declaration in opposition to the Defendants' motion to dismiss the complaint in this action.

2.      Attached as Exhibit A is a true and accurate copy of 24 CFR Part 207 (1977).

3.      Attached as Exhibit B is a true and accurate copy of the mortgage note secured by the HUD-insured, Section 236-assisted senior mortgage loan referred to by Plaintiffs in their accompanying Memorandum in Opposition to Defendants' Motion to Dismiss as the "Senior Note."

4.    Attached as <u>Exhibit C</u> is a true and accurate copy of an October 11, 2007 memorandum from Millicent B. Potts, HUD's Assistant General Counsel for Multifamily Mortgage Insurance, to Beverly J. Miller, Director, Office of Asset Management (the "Office of General Counsel Memo").

5.    Attached as <u>Exhibit D</u> is a true and accurate copy of a December 20, 2007 Press Release from the office of Senator Charles Schumer (D-NY), obtained from Senator Schumer's website.

6.    Attached as <u>Exhibit E</u> is a true and accurate copy of a 1995 Opinion issued by HUD's Associate General Counsel for Insured Housing, Legal Op. CIM-0111 (May 1, 1995) (the "1995 HUD Opinion").

I declare, under penalties of perjury, that the foregoing is true and correct.

Executed:  May 5, 2008

Stephen B. Meister

# EXHIBIT A
# (Part I)

of the outstanding principal balance of the mortgage at the end of the previous mortgage insurance year, which shall be adjusted to give effect to reductions in the principal balance of the mortgage resulting from sale of portions of the property covered by the mortgage, but without taking into consideration delinquent payments or prepayments.

(3) If the mortgage term exceeds 3 years and contains amortization provisions, the mortgage insurance premium shall be adjusted so that subsequent mortgage insurance premiums shall be paid on the anniversary dates of the commencement of amortization rather than on the anniversary dates of the initial endorsement of the mortgage for insurance.

(b) If the mortgage covers a water and/or sewer system, the mortgage insurance premium shall be paid as follows:

(1) Upon initial endorsement of the mortgage for insurance, there shall be paid an amount equal to one-twelfth of 1 percent of the original face amount of the mortgage for each month or fraction thereof prior to the date of commencement of amortization.

(2) Upon commencement of amortization and on each anniversary date thereafter until the mortgage is paid in full (or until receipt by the Commissioner of an application for insurance benefits, or until the contract of mortgage insurance is otherwise terminated with the consent of the Commissioner), there shall be paid an amount equal to three-fourths of 1 percent of the average outstanding principal balance of the mortgage for the year following the date on which such premium becomes payable, without taking into consideration delinquent payments or prepayments.

## PART 207—MULTIFAMILY HOUSING MORTGAGE INSURANCE

### Subpart A—Eligibility Requirements

APPLICATIONS AND COMMITMENTS

Sec.
207.1  Application, SAMA letter, commitments and required fees.
207.2  Maximum fees and charges by mortgagee.

ELIGIBLE MORTGAGES

207.3  Mortgage provisions.
207.4  Maximum mortgage amounts.
207.5  Maturity.
207.6  Payment requirements.

Sec.
207.7  Maximum interest rate.
207.8  Mortgage to cover the entire property.
207.9  Covenant against liens.
207.10  Covenant for fire insurance.
207.11  Soundness of project.
207.12  Accumulation of accruals.
207.13  Application of payments.
207.14  Prepayment privilege; prepayment and late charges.
207.15  Issuance of bonds secured by trust indenture.
207.16  Mortgagor's certificate of nondiscrimination and mortgage covenant regarding use of property

ELIGIBLE MORTGAGORS

207.17  Classification.

SUPERVISION OF MORTGAGORS

207.18  In general.
207.19  Required supervision of private mortgagors.
207.20  Occupancy requirements.
207.21  Racial discrimination prohibited.

ELIGIBLE MORTGAGEES

207.22  Qualification of lenders.

PROPERTY REQUIREMENTS

207.23  Eligibility of property.
207.24  Development of property.

ADJUSTMENT OF MORTGAGE AMOUNT

207.25  Certification of cost requirements
207.26  Form of contract.
207.26a  Disposition of general contractor's holdback.
207.27  Certificates of actual cost.
207.28  Adjustment resulting from cost certification.
207.29  Rehabilitation projects.
207.30  Requisites of agreement and certification.

OTHER ELIGIBLE MORTGAGES

207.31  Eligibility of miscellaneous type mortgages.
207.31a  Eligibility of mortgages covering housing in certain neighborhoods.
207.32  Eligibility of refinancing transactions.
207.32a  Eligibility of mortgages on existing projects.
207.33  Eligibility of mortgages on mobile home courts or parks.
207.34  Reinsurance of Commissioner-held mortgages.

TITLE

207.35  Eligibility of title
207.36  Title evidence.

EXTENSION OF TIME

207.36a  Actions by Commissioner.
207.249  Effect of amendments.

397

§ 207.1          Title 24—Housing and Urban Development

Subpart B—Contract Rights and Obligations

Sec.
207.251   Definitions.

PREMIUMS

207.252   First, second and third premiums.
207.252a  Premiums—operating loss loans.
207.252b  Premiums—mortgages insured pursuant to section 223(f) of the Act.
207.253   Termination by prepayment and voluntary termination.
207.253a  Termination of insurance contract

INSURANCE ENDORSEMENT

207.254   Insurance endorsement.

RIGHTS AND DUTIES OF MORTGAGEE UNDER THE CONTRACT OF INSURANCE

207.255   Defaults.
207.256   Notice.
207.256a  Reinstatement of defaulted mortgage.
207.256b  Modification of mortgage terms.
207.257   Commissioner's right to require acceleration.
207.258   Insurance claim requirements.
207.258a  Title requirements.
207.259   Insurance benefits.
207.259a  Waiver of title objection; mortgages formerly Commissioner-held.
207.260   Protection of mortgage security.

ASSIGNMENTS

207.261   Assignment of insured mortgages.

EXTENSION OF TIME

207.261a  Actions to be taken by mortgagee.

RIGHTS IN HOUSING FUND

207.262   No vested right in fund.

AMENDMENTS

207.499   Effect of amendments.

AUTHORITY: The provisions of this Part 207 issued under secs. 207, 211, 52 Stat. 16, as amended, 23, as amended; 12 U.S.C. 1713, 1715b

SOURCE: The provisions of this Part 207 appear at 36 FR 24537, Dec. 22, 1971, unless otherwise noted.

Subpart A—Eligibility Requirements

APPLICATION AND COMMITMENTS

§ 207.1   Application, SAMA letter, commitments and required fees.

(a) *Application.* An application for the issuance of a site appraisal and market analysis (SAMA) letter must be submitted by the project sponsor. An application for a conditional or firm commitment for insurance of a mortgage on a project shall be submitted by the sponsor and an approved mortgagee. Such application shall be submitted to the local HUD field office on FHA approved forms. No application shall be considered unless accompanied by the exhibits required by the form. An applicant may initially elect to submit an application for a SAMA letter, a conditional commitment or a firm commitment depending upon the completeness of the drawings, specifications and other required exhibits.

(1) *Application fee—SAMA letter.* An application fee of $1 per thousand dollars of the requested mortgage shall accompany the application for a SAMA letter.

(2) *Application fee—conditional commitment.* An application-commitment fee of $1 per thousand dollars of the requested mortgage amount shall accompany the application for conditional commitment in cases in which the application fee for an unexpired SAMA letter has been collected. A fee of $2 per one thousand dollars of the requested mortgage amount shall accompany the application for conditional commitment in cases in which the SAMA application fee has been paid but the SAMA letter has expired or in cases in which a SAMA application fee has not been paid.

(3) *Application fee—firm commitment.* An application for firm commitment shall be accompanied by an application-commitment fee which, when added to prior fees received in connection with applications for a SAMA letter or a conditional commitment, will aggregate $3 per thousand dollars of the requested mortgage amount to be insured. The payment of an application-commitment fee shall not be required in connection with an insured mortgage involving the sale by the government of housing or property acquired, held or contracted, pursuant to the Atomic Energy Community Act of 1955, as provided in § 207.31(b)(4).

(b) *Effect of SAMA letter, conditional and firm commitment—*(1) *SAMA letter* The issuance of a SAMA letter indicates completion of the site appraisal and market analysis stage to determine initial acceptability of the site and recognition of a specific market need. The SAMA letter is not a commitment to insure a mortgage for the proposed project and does not bind the Commissioner to issue a firm commitment to insure. The SAMA letter precedes the later submission of acceptable plans and specifications for the proposed project and is limited to advising the applicant as to the following determinations of the Commissioner, which

398

shall not be changed to the detriment of an applicant, if the application for a commitment is received before expiration of the SAMA letter:

(i) The land value fully improved (with offsite improvements installed).

(ii) The acceptability of the proposed project site, the proposed composition, number and size of the units and the market for the number of proposed units. Where the application is not acceptable as submitted, but can be made acceptable by a change in the number, size, or composition of the units, the SAMA letter may establish the specific lesser number of units which would be acceptable and any acceptable alternative plan for the composition and size of units.

(iii) The acceptability of the unit rents proposed. Where rent levels are unacceptable, the SAMA letter may establish specific rents which are acceptable.

(iv) The applicable land use intensity number, from which may be determined the maximum floor area and minimum acceptable recreational, parking, living and open space areas acceptable to the Commissioner for the proposed project.

(2) *Conditional commitment.* The issuance of a conditional commitment indicates completion of technical processing involving the estimated cost of the project, the "as is" value of the site, the detailed estimates of operating expenses and taxes, the supportable cost, the financial and credit capacity of the sponsorship, financial requirements and the mortgage amount.

(3) *Firm commitment and types of firm commitment.* The issuance of a firm commitment evidences the Commissioner's approval of the application for insurance and sets forth the terms and conditions upon which the mortgage will be insured. The firm commitment may provide for the insurance of advances of mortgage money made during construction or may provide for the insurance of the mortgage upon completion of the improvements.

(c) *Term of SAMA letter, conditional commitment and firm commitment*—(1) *SAMA letter.* A SAMA letter shall be effective for whatever term is specified in the letter.

(2) *Conditional commitment.* A conditional commitment shall be effective for whatever term is specified in the text of the commitment.

(3) *Firm commitment.* (i) Insurance of advances: A firm commitment to insure advances shall be effective for a period of not more than 60 days from the date of issuance.

(ii) Insurance upon completion: A firm commitment to insure upon completion shall be effective for a designated term within which the mortgagor is required to begin construction and, if construction is begun as required, the commitment shall be effective for such additional period as the Commissioner estimates is necessary for the completion of construction and for obtaining sustaining occupancy.

(iii) The term of either a SAMA letter, or conditional or firm commitment may be extended in such manner as the Commissioner may prescribe.

(d) *Rejection of an application.* A significant deviation in an application from the terms or findings arrived at in an earlier stage, as evidenced by the SAMA letter or conditional commitment, shall be grounds for rejection of an application for conditional or firm commitment, respectively. The fees paid to such date shall be considered as having been earned notwithstanding such rejection.

(e) *Inspection fee.* The firm commitment may provide for the payment of an inspection fee in an amount not to exceed $5 per thousand dollars of the commitment. If an inspection fee is required, it shall be paid for as follows:

(1) If the case involves the insurance of advances, it shall be paid at the time of initial endorsement.

(2) If the case involves insurance upon completion, it shall be paid prior to the date construction is begun.

(f) *Fees on increases*—(1) *Increase in firm commitment prior to endorsement.* An application, filed prior to initial endorsement (or prior to endorsement in a case involving insurance upon completion), for an increase in the amount of an outstanding firm commitment shall be accompanied by a combined additional application and commitment fee. This combined additional fee shall be in an amount which will aggregate $3 per thousand dollars of the amount of the requested increase. If an inspection fee was required in the original commitment, an additional inspection fee shall be paid in an amount computed at the same dollar rate per thousand dollars of the amount of increase in commitment as was used for the inspection fee required in the original commitment. When insurance of advances is involved, the additional inspection fee shall be paid at the time of initial endorsement. When

399

§ 207.2    **Title 24—Housing and Urban Development**

insurance upon completion is involved, the additional inspection fee shall be paid prior to the date construction is begun or if construction has begun, it shall be paid with the application for increase.

(2) *Increase in mortgage between initial and final endorsement.* Upon an application, filed between initial and final endorsement, for an increase in the amount of the mortgage, either by amendment or by substitution of a new mortgage, a combined additional application and commitment fee shall accompany the application. This combined additional fee shall be in an amount which will aggregate $3 per thousand dollars of the amount of the increase requested. If an inspection fee was required in the original commitment, and additional inspection fee shall accompany the application in an amount not to exceed the $5 per thousand dollars of the amount of the increase requested.

(3) *Loan to cover operating losses.* In connection with a loan to cover operating losses occurring during the first 2 years following completion of the project, a combined application and commitment fee of $3 per thousand dollars of the amount of the loan applied for shall be submitted with the application for the commitment. No inspection fee shall be required.

(g) *Reopening of expired commitments.* An expired conditional or firm commitment may be reopened if a request for reopening is received by the Commissioner within 90 days of the expiration of the commitment. The reopening request shall be accompanied by a fee of 50 cents per thousand dollars of the amount of the expired commitment. If the reopening request is not received by the Commissioner within the required 90-day period, a new application, accompanied by the required application and commitment fee, must be submitted.

(h) *Transfer fee.* Upon application for approval of a transfer of physical assets or the substitution of mortgagors, a transfer fee of 50 cents per thousand dollars shall be paid on the original face amount of the mortgage in all cases, except that a transfer fee shall not be paid where both parties to the transfer transaction are nonprofit organizations.

(i) *Refund of fees.* If the amount of the commitment issued or increase in mortgage granted is less than the amount applied for, the Commissioner shall refund the excess amount of the application and commitment fees submitted by the applicant. If an application is rejected before it is assigned for processing, or in such other instances as the Commissioner may determine, the entire application and commitment fees or any portion thereof may be returned to the applicant. Commitment, inspection and reopening fees may be refunded, in whole or in part, if it is determined by the Commissioner that there is a lack of need for the housing or that the construction or financing of the project has been prevented because of condemnation proceedings or other legal action taken by a governmental body or public agency, or in such other instances as the Commissioner may determine. A transfer fee may be refunded only in such instances as the Commissioner may determine.

(j) *Fees not required.* The payment of an application, commitment, inspection, or reopening fee shall not be required in connection with the insurance of a mortgage involving the sale by the Secretary of any property acquired under any section or title of the Act.

[36 FR 24587, Dec. 22, 1971, as amended at 39 FR 12002, Apr. 2, 1974; 40 FR 22828, May 27, 1975; 41 FR 14861, Apr. 8, 1976]

§ 207.2  **Maximum fees and charges by mortgagee.**

The mortgagee may collect from the mortgagor the amount of the fees provided for in this subpart. The mortgagee may also collect from the mortgagor an initial service charge in an amount not to exceed 2 percent of the original principal amount of the mortgage, to reimburse the mortgagee for the cost of closing the transaction. Any additional charges or fees collected from the mortgagor shall be subject to prior approval of the Commissioner.

ELIGIBLE MORTGAGES

§ 207.3  **Mortgage provisions.**

(a) *Mortgage form.* The mortgage shall be:

(1) Executed on a form approved by the Commissioner for use in the jurisdiction in which the property covered by the mortgage is situated, which form shall not be changed without the prior written approval of the Commissioner.

(2) Executed by a mortgagor with the qualifications as provided in this subpart.

(3) A first lien on property that conforms with the property standards prescribed by the Commissioner.

400

(b) *Disbursement of the mortgage.* The mortgagee shall be obligated, as a part of the mortgage transaction, to disburse the principal amount of the mortgage, to, or for the account of the mortgagor or to his creditors for his account and with his consent.

§ 207.4    Maximum mortgage amounts.

(a) *Dollar and loan-to-value limitations.* A mortgage may involve a principal obligation not in excess of the lesser of the following:

(1) 90 percent of the estimated value (replacement cost if project is located in Alaska or Guam) of the project; or

(2) For such part of the property or project attributable to dwelling use (excluding exterior land improvements as defined by the Commissioner) an amount per family unit, depending on the number of bedrooms, which may be:

(i) $19,500 without a bedroom.
(ii) $21,600 with one bedroom.
(iii) $25,800 with two bedrooms.
(iv) $81,800 with three bedrooms.
(v) $36,000 with four or more bedrooms.

(b) *Increased mortgage amount—elevator type structures.* In order to compensate for the higher costs incident to construction of elevator type structures of sound standards of construction and design, the Commissioner may increase the dollar amount limitations per family unit as provided in paragraph (a) (2) of this section not to exceed:

(1) $22,500 without a bedroom.
(2) $25,200 with one bedroom.
(3) $30,900 with two bedrooms.
(4) $38,700 with three bedrooms.
(5) $43,758 with four or more bedrooms.

(c) *Increased mortgage amount—high cost areas.* (1) In any geographical area where the Commissioner finds cost levels so require, the Commissioner may increase by not to exceed 50 percent, the dollar amount limitations set forth in paragraphs (a) (2) and (b) of this section.

(2) If the Commissioner finds that because of high costs in Alaska, Guam, or Hawaii it is not feasible to construct dwellings without the sacrifice of sound standards of construction, design, and livability within the limitations of maximum mortgage amounts provided in this section, the principal obligation of mortgages may be increased in such amounts as may be necessary to compensate for such costs, but not to exceed in any event the maximum, including

high cost area increases, if any, otherwise applicable by more than one-half thereof.

(d) *Adjusted mortgage amount—rehabilitation projects.* A mortgage having a principal amount computed in compliance with the applicable provisions of this section, and which involves a project to be repaired or rehabilitated, shall be subject to the following additional limitations:

(1) *Property held in fee.* If the mortgagor is the fee simple owner of the project, the maximum mortgage amount shall not exceed 100 percent of the Commissioner's estimate of the cost of the proposed repairs or rehabilitation; or

(2) *Property subject to existing mortgage.* If the mortgagor owns the project subject to an outstanding indebtedness, which is to be refinanced with part of the insured mortgage, the maximum mortgage amount shall not exceed: (i) The Commissioner's estimate of the cost of the repair or rehabilitation; plus (ii) such portion of the outstanding indebtedness as does not exceed 90 percent of the Commissioner's estimate of the fair market value of such land and improvements prior to the repair or rehabilitation; or.

(3) *Property to be acquired.* If the project is to be acquired by the mortgagor and the purchase price is to be financed with a part of the insured mortgage, the maximum mortgage amount shall not exceed 90 percent of: (i) The Commissioner's estimate of the cost of the repair or rehabilitation and (ii) the actual purchase price of the land and improvements, but not in excess of the Commissioner's estimate of the fair market value of such land and improvements prior to the repair or rehabilitation.

(e) *Reduced mortgage amount—leaseholds.* In the event the mortgage is secured by a leasehold estate rather than a fee simple estate, the value or replacement cost of the property described in the mortgage shall be the value or replacement cost of the leasehold estate (as determined by the Commissioner) which shall in all cases be less than the value or replacement cost of the property in fee simple.

(f) *Loans to cover 2-year operating loss.*—(1) *Operating loss determination.* When the Commissioner determines that an operating loss has occurred during the first 2 years following completion of the project, he may, in his discretion, accept

401

§ 207.5        **Title 24—Housing and Urban Development**

for insurance under this part, a loan to cover such loss. For the purposes of this section, an operating loss shall occur when the Commissioner determines that the total of the taxes, interest on the mortgage debt, mortgage insurance premiums, hazard insurance premiums, and the expense of maintenance and operation of the project (excluding depreciation) exceeds the project income.

(2) *Security instrument.* The loan shall be secured by an instrument in a form approved by the Commissioner for use in the jurisdiction in which the project is located.

(3) *Maximum interest rate.* The loan may bear interest at such rate as may be agreed upon by the mortgagee and the mortgagor, but in no case shall such rate exceed the rate in effect under § 207.7 on the date the commitment is issued Interest shall be payable in monthly installments on the principal then outstanding.

(4) *Maturity.* The loan shall be limited to a term not exceeding the unexpired term of the original mortgage.

[36 FR 24537, Dec. 22, 1971, as amended at 39 FR 32435, Sept. 6, 1974; 41 FR 11286, Mar. 18, 1976; 41 FR 41880, Sept. 23, 1976]

§ 207.5   **Maturity.**

The mortgage shall have a maturity satisfactory to the Commissioner, depending upon the risk involved and the general character of the project, and shall contain complete amortization or sinking-fund provisions satisfactory to the Commissioner.

§ 207.6   **Payment requirements.**

(a) *Method of payment.* The mortgage shall provide for monthly payments on the first day of each month on account of interest and principal and shall provide for payments in accordance with an amortization plan as agreed upon by the mortgagor, the mortgagee and the Commissioner.

(b) *Date of first payment to principal* The Commissioner shall estimate the time necessary to complete the project and shall establish the date of the first payment to principal so that the lapse of time between completion of the project and commencement of amortization will not be longer than necessary to obtain sustaining occupancy.

§ 207.7   **Maximum interest rate.**

(a) The mortgage shall bear interest at the rate agreed upon by the mortgagee

and the mortgagor, which rate shall not exceed 9 percent per annum with respect to mortgages receiving initial endorsement (or endorsement in cases involving insurance upon completion) on or after September 2, 1975.

(b) Interest shall be payable in monthly installments on the principal amount of the mortgage outstanding on the due date of each installment.

(c) The amount of any increase approved by the Commissioner in the mortgage amount between initial and final endorsement in excess of that which the Commissioner had committed to insure at initial endorsement, shall bear interest at the rate agreed upon by the mortgagor and the mortgagee which rate shall not exceed the greater of: (1) the maximum interest rate established by the Secretary and in effect at the time the mortgage was initially endorsed, (2) the maximum interest rate established by the the Secretary and in effect at the time the application for a mortgage increase was received by the Commissioner, or (3) the maximum interest rate established by the Secretary and in effect at the time the increase is approved by the Commissioner.

[36 FR 24537, Dec. 22, 1971, as amended at 40 FR 47105, Oct. 8, 1975; 40 FR 58133, Dec. 15, 1975]

§ 207.8   **Mortgage to cover the entire property.**

The mortgage shall cover the entire property included in the housing project.

§ 207.9   **Covenant against liens.**

The mortgage shall contain a covenant against the creation by the mortgagor of liens against the property superior or inferior to the lien of the mortgage except for such inferior lien as may be required in connection with the insurance of an operating loss loan or a supplementary loan. An inferior lien may be created on a project which is subject to a mortgage insured pursuant to § 207.-32a: *Provided,* That such lien will be limited by § 207.32a(j).

[36 FR 24537, Dec. 22, 1971, as amended at 40 FR 43899, Sept. 24, 1975]

§ 207.10   **Covenant for fire insurance.**

The mortgage shall contain a covenant acceptable to the Commissioner binding the mortgagor to keep the property insured by a standard policy or policies against fire and such other hazards as the Commissioner, upon the insurance of the mortgage, may stipulate, in an

402

amount which will comply with the co-insurance clause applicable to the location and character of the property, but not less than 80 percent of the actual cash value of the insurable improvements and equipment of the project. The initial coverage shall be in an amount estimated by the Commissioner at the time of completion of the entire project or units thereof. The policies evidencing such insurance shall have attached thereto a standard mortgagee clause making loss payable to the mortgagee and the Commissioner, as interests may appear.

§ 207.11  Soundness of project.

No mortgage shall be accepted for insurance unless the Commissioner finds that the property or project with respect to which the mortgage is executed is economically sound, except that as to mortgages covering property located in Alaska or in Guam, or in Hawaii, no mortgage shall be accepted for insurance unless the Commissioner finds that the property or project is an acceptable risk giving consideration to the acute housing shortage in Alaska, or in Guam, or in Hawaii.

§ 207.12  Accumulation of accruals.

(a) The mortgage shall provide for payments by the mortgagor to the mortgagee on each interest payment date of an amount sufficient to accumulate in the hands of the mortgagee one payment period prior to its due date, the next annual mortgage insurance premium payable by the mortgagee to the Commissioner. Such payments shall continue only so long as the contract of insurance shall remain in effect.

(b) The mortgage shall provide for such equal monthly payments by the mortgagor to the mortgagee as will amortize the ground rents, if any, and the estimated amount of all taxes, water rates and special assessments, if any, and fire and other hazard insurance premiums, within a period ending one month prior to the dates on which the same become delinquent. The mortgage shall further provide that such payments shall be held by the mortgagee, for the purpose of paying such ground rents, taxes, water rates and assessments, and insurance premiums, before the same become delinquent. The mortgage must also make provision for adjustments, in case the estimated amount of such taxes, water rates and assessments, and insur-

ance premiums shall prove to be more, or less, than the actual amount thereof so paid by the mortgagor.

§ 207.13  Application of payments.

(a) The mortgage shall provide that all monthly payments to be made by the mortgagor to the mortgagee shall be added together and the aggregate amount thereof shall be paid by the mortgagor upon each monthly payment date in a single payment. The mortgagee shall apply the same to the following items in the order set forth:

(1) Premium charges under the contract of insurance;

(2) Ground rents, taxes, special assessment and fire and other hazard insurance premiums;

(3) Interest on the mortgage;

(4) Amortization of the principal of the mortgage.

(b) Any deficiency in the amount of any such aggregate monthly payment shall constitute an event of default. The mortgage shall further provide for a grace period of 30 days, within which time the default must be made good.

§ 207.14  Prepayment privilege; prepayment and late charges.

(a) Prepayment privilege. The mortgage shall contain a provision permitting the mortgagor to prepay the mortgage in whole or in part upon any interest payment date after giving to the mortgagee 30 days' notice in writing in advance of its intention to so prepay.

(b) Prepayment charge. The mortgage may contain a provision for such additional charge in the event of prepayment of principal as may be agreed upon between the mortgagor and mortgagee. However, the mortgagor shall be permitted to prepay up to 15 percent of the original principal amount of the mortgage in any one calendar year without any such additional charge. Any reduction in the original principal amount of the mortgage resulting from the certification of cost requirements of this part shall not be construed as a prepayment of the mortgage.

(c) Late charge. The mortgage may provide for the collection by the mortgagee of a late charge, not to exceed 2 cents for each dollar of each payment to interest or principal more than 15 days in arrears, to cover the expense involved in handling delinquent payments. Late charges shall be separately charged to and collected from the mortgagor and

403

§ 207.15          Title 24—Housing and Urban Development

shall not be deducted from any aggregate monthly payment.

§ 207.15   Issuance of bonds secured by trust indenture.

In the event that bonds or other obligations are to be issued as a part of the insured mortgage transaction, the form of bonds and the form of trust indenture shall be subject to the approval of the Commissioner, and shall be subject to the following conditions:

(a) The Trustee named in such trust indenture shall be a banking institution or trust company (authorized to act in a fiduciary capacity and which is a mortgagee approved by the Commissioner); and

(b) The Trustee shall be the holder of record of the insured mortgage (represented by the trust indenture) and shall be authorized to act on behalf of the holders of such bonds or other obligations in all matters concerning the mortgage insurance contract; and

(c) The holders of the bonds or other obligations shall look solely to the Trustee for the benefits of the contract of mortgage insurance and the trust indenture shall expressly authorize the Commissioner to make payment of any claim under the contract of mortgage insurance to the Trustee, without liability or accountability to the bond holders to see to the application of the mortgage insurance contract benefits; and

(d) The bonds or other obligations shall be issued only to holders meeting the following qualifications:

(1) A mortgagee approved by the Commissioner;

(2) A pension or retirement fund or a profit-sharing plan maintained and administered by a corporation or by a governmental agency or by a trustee or trustees, which has lawful authority to acquire the bonds or other obligations; or

(3) A charitable or nonprofit organization.

§ 207.16   Mortgagor's certificate of non-discrimination and mortgage covenant regarding use of property.

(a) The mortgagor shall certify to the Commissioner as to each of the following points:

(1) That neither he (it), nor anyone authorized to act for him (it), will refuse to sell or rent, after the making of a bona fide offer, or refuse to negotiate for the sale or rental of, or otherwise make

unavailable or deny the property covered by the mortgage to any person because of race, color, religion, or national origin.

(2) That any restrictive covenant on such property relating to race, color, religion, or national origin is recognized as being illegal and void and is hereby specifically disclaimed.

(3) That civil action for preventative relief may be brought by the Attorney General in any appropriate U.S. District Court against any person responsible for a violation of this certification.

(b) The mortgage shall contain a covenant prohibiting the use of the property covered thereby for any purpose other than that for which it was intended at the date the mortgage was executed.

ELIGIBLE MORTGAGORS

§ 207.17   Classification.

In order to be eligible as a mortgagor under this subpart the applicant must be:

(a) *Private mortgagors.* Any mortgagor approved by the Commissioner, which until the termination of all obligations of the Commissioner under the insurance contract and during such further period of time as the Commissioner shall be the owner, holder, or reinsurer of the mortgage, is regulated or restricted by the Commissioner as to rents or sales, charges, capital structure, rate of return, and methods of operation.

(b) *Public mortgagors.* A federal or state instrumentality, a municipal corporate instrumentality of one or more states, or a limited dividend or redevelopment or housing corporation formed under and restricted by federal or state laws or regulations of a state banking or insurance department as to rents, charges, capital structure, rate of return, or methods of operation.

SUPERVISION OF MORTGAGORS

§ 207.18   In general.

(a) In the case of an eligible mortgagor which is regulated or restricted for the purposes and in the manner provided in § 207.17(b), or in the case in which the mortgagor or mortgagee is the Alaska Housing Authority, or the Government of Guam or Hawaii or any agency or instrumentality thereof, liens inferior to the lien of the insured mortgage may be allowed against properties of such mortgagors: *Provided,* That the mortgagor in any such case, must have initial funds

404

Chap. II—Office of Assistant Secretary for Housing                    § 207.19

which may be considered in lieu of the equity required of other mortgagors, and such funds (which may be in the form of Government loans, grants, or subsidies or in other form) if sufficient in amount, will be considered satisfactory provided they do not create a lien against the property prior to that of the insured mortgage.

(b) In all other cases a mortgagor must certify at final endorsement of the loan for insurance that the property covered by the mortgage is free and clear of all liens other than such mortgage, and that there will not be outstanding any other unpaid obligation contracted in connection with the mortgage transaction, the purchase of the mortgaged property, or the construction of the project, except such obligations as may be approved by the Commissioner as to terms, form and amount.

(c) In the case of a private corporation, the Commissioner's regulations or restrictions will be set forth in its certificate of incorporation or charter under which such mortgagor is created, and will be made effective through the issuance of certain shares of special stock, which stock will acquire majority voting rights in the event of default under the mortgage or violation of a provision of the charter. Such special stock or interest issued to the Commissioner, his nominee or nominees and/or the Federal Housing Administration shall be in sufficient amount to constitute under the laws of the particular state a valid special class of stock or interest and shall be issued in consideration of the payment by the Commissioner of not exceeding in the aggregate $100. Such stock shall be represented by a certificate or certificates issued in the name of the Commissioner, and/or in the name of his nominee or nominees, and/or in the name of the Federal Housing Administration, as the Commissioner shall require. In the case of a private association or trust entity, or whenever, for any reason satisfactory to the Commissioner, such regulations or restrictions are not feasible as to a particular mortgagor through the issuance of shares of special stock, such regulations or restrictions shall be effected by means of a regulatory agreement and/or other contractual documents between the Commissioner and the mortgagor in such form and in such manner as shall be satisfactory to the Commissioner. Upon the termination of all obligations of the Commis-

sioner under his contract of mortgage insurance, or any succeeding contract or agreement covering the mortgage obligation, all regulations and restrictions of the mortgagor shall cease, the shares of special stock shall be surrendered by the Commissioner upon reimbursement of his payments therefor, plus accrued dividends, if any, thereon, and any regulatory agreement or contract shall terminate.

§ 207.19  Required supervision of private mortgagers.

The following are the items which will be regulated or restricted, except in the case of mortgagors of the character described in § 207.17(b):

(a) *Capital structure.* (1) The number of shares of capital stock, in the case of a corporation, may be issued in such amounts and form as may be agreed upon by the sponsors and the Commissioner prior to the endorsement of the mortgage for insurance; and

(2) In the case of a trust entity beneficial certificates of interest may be issued in such amounts and form as may be agreed upon by the mortgagor and the Commissioner.

(b) *Rate of return.* Dividends or other distributions, as defined in the charter, trust agreement, or regulatory agreement, may be declared or made only as of or after the end of a semiannual or annual fiscal period. No dividends or other distributions shall be declared or made except out of surplus cash legally available and remaining after:

(1) The payment of:

(i) All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Commissioner;

(ii) All amounts required to be deposited in the Reserve Fund for Replacements;

(iii) All obligations of the project other than the mortgage insured or held by the Commissioner unless funds for payment are set aside or deferment of payment has been approved by the Commissioner.

(2) The segregation of:

(i) An amount equal to the aggregate of all special funds required to be maintained by the project;

(ii) All tenant security deposits held. No distributions of any kind may be made from borrowed funds.

(c) *Requirements incident to insurance of advances.* (1) The mortgagor

405

shall deposit with the mortgagee, or in a depository satisfactory to the mortgagee and under control of the mortgagee, for the purpose of meeting the cost of equipping and renting the project subsequent to completion of construction of the entire project or units thereof and, during the course of construction, for allocation by the mortgagee to accruals for taxes, ground rates, mortgage insurance premiums, property insurance premiums, and assessments required by the terms of the mortgage:

(i) In the case of new construction, an amount equivalent to not less than two percent of the original principal amount of the mortgage.

(ii) In the case of rehabilitation, an amount satisfactory to the Commissioner.

(2) Prior to initial endorsement, the mortgagor shall deposit with the mortgagee cash deemed by the Commissioner to be sufficient, when added to the proceeds of the insured mortgage, to assure completion of the project and to pay the initial service charge, the carrying charges, and the legal and organization expenses incident to the construction of the project. Such funds shall be held by the mortgagee in a special account or by an acceptable depository designated by the mortgagee under an appropriate agreement approved by the Commissioner requiring all such funds to be disbursed for work and material on the physical improvements, and for other charges and expenses to be paid when due, prior to the advances of any mortgage money.

(3) All fees and charges to be paid by the mortgagor in connection with financing which are in excess of the initial service charge and which have been approved by the Commissioner, shall be deposited with the mortgagee in cash, prior to initial endorsement, unless other arrangements acceptable to the Commissioner are made.

(4) The Commissioner shall require assurance of completion of offsite public utilities and streets in all cases, except where a municipality or other public body has by agreement (acceptable to the Commissioner) agreed to install such utilities and streets without cost to the mortgagor. Where such assurance is required, it shall be either in the form of a cash escrow deposit or the retention of a specified amount of mortgage proceeds by the mortgagee. If a cash escrow is used, it shall be deposited with the mort-

gagee or with an acceptable trustee or escrow agent designated by the mortgagee. If mortgage proceeds are used, the mortgagee shall retain under terms approved by the Commissioner, rather than disburse at the initial closing of the mortgage, a portion of the mortgage proceeds allocated to land in the project analysis. As additional assurance, the Commissioner may also require a surety company bond or bonds.

(5) Prior to the initial endorsement of the mortgage for insurance, the mortgagor and the mortgagee shall execute a building loan agreement, approved by the Commissioner, setting forth the terms and conditions under which progress payments may be advanced during construction. To be covered by mortgage insurance, each progress payment shall be approved by the Commissioner.

(6) The mortgagor shall furnish assurance of completion of the project in the form of a personal indemnity agreement, corporate surety bonds for payment and performance, or a completion assurance agreement secured by a cash deposit. All types of assurance of completion shall be on forms approved by the Commissioner. All surety companies issuing bonds and all parties executing a personal indemnity agreement must be satisfactory to the Commissioner. The minimum requirements for assurance of completion are as follows:

(i) Where the estimated cost of construction or rehabilitation is $500,000 or less, the assurance of completion will be accepted in the form of a personal indemnity agreement executed by the principal officers, directors, stockholders, or partners of the entity acting as general contractor, or by the individuals operating as the general contractor. Where the estimated cost of construction or rehabilitation is more than $500,000 or where such cost is less than $500,000 and a personal indemnity agreement is not executed, the assurance shall be as set forth in paragraph (c)(6)(ii) or (iii) of this section.

(ii) Where the structure contains no elevator, or where the structure contains an elevator and is three stories or less, assurance shall be by corporate surety bonds for payment and performance each in the amount of 25 percent of the amount of the construction contract, or a completion assurance agreement secured by a cash deposit in the amount of 15 percent of the amount of the construction contract.

406

Chap. II—Office of Assistant Secretary for Housing                    § 207.19

(iii) Where the structure contains an elevator and is four stories or more, assurance shall be by corporate surety bonds for payment and performance, each in the amount of 50 percent of the amount of the construction contract, or a completion assurance agreement secured by a cash deposit in the amount of 25 percent of the amount of the construction contract.

(iv) A mortgagee may prescribe more stringent requirements for assurance of completion than the minimum requirements of this section.

(7) The mortgagee may accept, in lieu of a cash deposit required by subparagraphs (1), (3), (4), and (6) of this paragraph, an unconditional irrevocable letter of credit issued to the mortgagee by a banking institution. In the event a demand under the letter of credit is not immediately met, the mortgagee shall forthwith provide cash equivalent to the undrawn balance thereunder.

(d) *Labor standards and prevailing wage requirements.* (1) Any contract, subcontract, or building loan agreement executed for the performance of construction of the project shall comply with all applicable labor standards and provisions of the regulations of the Secretary of Labor issued May 9, 1951, 29 CFR 5.1–5.12 (16 F.R. 4430).

(2) No construction contract shall be entered into with a general contractor or any subcontractor if such contractor or any such subcontractor or any firm, corporation, partnership or association in which such contractor or subcontractor has a substantial interest is included on the ineligible list of contractors or subcontractors established and maintained by the Comptroller General, pursuant to § 5.6(b) of the Regulations of the Secretary of Labor, issued May 9, 1951 (29 CFR 5.6(b)).

(3) No advance under the mortgage shall be eligible for insurance after notification from the Commissioner that the general contractor or any subcontractor or any firm, corporation, partnership or association in which such contractor or subcontractor has a substantial interest was, on the date the contract or subcontract was executed on the ineligible list established by the Comptroller General, pursuant to the provisions of the Secretary of Labor issued May 9, 1951 (29 CFR 5.6(b)).

(4) No advance under any mortgage shall be eligible for insurance unless

there is filed with the application for such advance a certificate or certificates in the form required by the Commissioner, supported by such other information as the Commissioner may prescribe, certifying that the laborers and mechanics employed in the construction of the dwelling or dwellings, or housing project involved have been paid not less than the wages prevailing in the locality in which the work was performed for the corresponding classes of laborers and mechanics employed on construction of a similar character, as determined by the Secretary of Labor prior to the beginning of construction and after the date of filing of the application for insurance.

(5) Compliance with the provisions of this subsection shall be evidenced at such time and in such manner as the Commissioner may prescribe.

(e) *Rents and charges.* No charge shall be made by the mortgagor for the accommodations, facilities or services offered by the project in excess of those approved by the Commissioner in writing prior to the opening of the project for rental. In approving such charges and in passing upon applications for changes, consideration will be given to the following and similar factors:

(1) Rental income necessary to maintain the economic soundness of the project.

(2) Rental income necessary to provide reasonable return on the investment consistent with providing reasonable rentals to tenants.

(f) *Methods of operation.*

(1) [Reserved]

(2) The mortgagor shall maintain its project, the grounds, buildings, and equipment appurtenant thereto, in good repair and will promptly complete necessary repairs and maintenance as required by the Commissioner.

(3) In all projects, except those involving rehabilitation where the mortgage does not exceed $200,000, a fund for replacements shall be established and maintained with the mortgagee. The amount and type of such fund and the conditions under which it shall be accumulated, replenished, and used, shall be specified in the charter, trust agreement, or regulatory agreement.

(4) The mortgagor, its property, equipment, buildings, plans, offices, apparatus, devices, books, contracts, records, documents, and papers shall be

80-078 O - 77 - - 27                    407

§ 207.20    **Title 24—Housing and Urban Development**

subject to inspection and examination by the Commissioner or his duly authorized agent at all reasonable times.

(5) The mortgagor shall execute and deliver to the Commissioner a certificate that the books and accounts of the mortgagor will be established and maintained in a manner satisfactory to the Commissioner on the date the certificate is executed. Such certificate shall be to the effect that so long as the mortgage is insured or held by the Commissioner the mortgagor's books and accounts will be kept in accordance with the requirements of the Commissioner; will be in such form as to permit a speedy and effective audit and as may otherwise be prescribed by the Commissioner; will be maintained for such periods of time as may be prescribed by the Commissioner, and will be available to the Commissioner and to the Comptroller General of the United States for such examination and audits as they may desire to make. The mortgagor shall file with the Commissioner and the mortgagee the following reports verified by the signature of such officers of the mortgagor as the Commissioner may designate and in such form as prescribed by the Commissioner:

(i) Monthly occupancy reports, when required by the Commissioner;

(ii) [Reserved]

(iii) Complete annual financial reports based upon examinations of the books and records of the mortgagor, prepared in accordance with the requirements of the Commissioner, certified to by an officer of the mortgagor and, when required by the Commissioner, prepared and certified by a Certified Public Accountant (or other person acceptable to the Commissioner), such reports to be submitted within sixty (60) days after the end of each fiscal year.

(iv) Specific answers to questions upon which information is desired from time to time relative to the actual cost of construction, the disposition of mortgage funds, the operation and condition of the property and the status of the insured mortgage;

(v) Properly certified copies of minutes of meetings of directors, officers, stockholders, shareholders, or beneficiaries.

(g) *Mortgagor's equity investment*—(1) *Amount and deposit.* Unless it can be established to the satisfaction of the Commissioner, prior to the final endorsement of the mortgage for insurance, that the mortgagor has an investment in the

project, represented by cash expenditures, in an amount equal to 3 percent of the total cost of the project as certified by the mortgagor and approved by the Commissioner, there shall be deposited in a special fund an amount equal to the difference between such 3 percent and the amount of any such investment for necessary expenses incident to the completion of the project. Disbursements from any such fund, prior to three years from the date of the final or initial-final endorsement of the mortgage for insurance, may be made only with the prior written approval of the Commissioner.

(2) *Cutoff date.* The provisions of subparagraph (1) of this paragraph shall be applicable only to those mortgages which have received final endorsement on or before November 15, 1962.

(h) *Advance amortization.* (1) If prior to the beginning of amortization net income, as defined by the Commissioner, is received as a result of the rental of the mortgaged property, such net income, to the extent determined by the Commissioner, shall be applied in one or more of the following ways:

(i) To advance amortization.

(ii) To offset the cost of approved capital improvements.

(iii) To be deposited in the reserve fund for replacement and to be held as a reserve in addition to the monthly deposits required by the regulatory agreement.

(2) The provisions of subparagraph (1) of this paragraph shall be applicable to commitments issued on or after December 3, 1963, and to commitments outstanding on that date where the mortgage has not received final endorsement. The provisions of subparagraph (1) of this paragraph shall not be applicable to a project involving rehabilitation where the mortgage does not exceed $200,000 [36 FR 24537, Dec. 22, 1971, as amended at 41 FR 41516, Sept. 22, 1976]

§ 207.20    Occupancy requirements.

(a) *Family with children.* The mortgagor shall certify under oath to the Commissioner that:

(1) In selecting tenants for the project covered by the mortgage, the mortgagor will not discriminate against any family by reason of the fact that there are children in the family; and

(2) The mortgagor will not sell the project while the mortgage insurance is

408

in effect unless the purchaser also so certifies.

(b) *Transient or hotel purposes.* The mortgagor shall certify under oath that, so long as the mortgage is insured by the Commissioner, the mortgagor will not rent, permit the rental or permit the offering for rental of the housing, or any part thereof, covered by such mortgage for transient or hotel purposes. For the purpose of this certificate, the term rental for transient or hotel purposes shall mean (1) rental for any period less than 30 days, or (2) any rental, if the occupants of the housing accommodations are provided customary hotel services such as room service for food and beverages, maid service, furnishing and laundering of linens, and bellboy service.

§ 207.21  Racial    discrimination    prohibited.

Any contract or subcontract executed for the performance of construction of the project shall contain a provision that there shall be no discrimination against any employee, or applicant for employment because of race, color, creed, or national origin. Where the mortgagor is the general contractor, the building loan agreement shall contain the above provisions.

ELIGIBLE MORTGAGEES

§ 207.22  Qualification of lenders.

The provisions of §§ 203.1 to 203.4 and 203.6 to 203.9 of this chapter shall govern the eligibility, qualifications and requirements of mortgages under this subpart.

PROPERTY REQUIREMENTS

§ 207.23  Eligibility of property.

(a) A mortgage to be eligible for insurance shall be on real estate held:

(1) In fee simple; or

(2) On the interest of the lessee under a lease for not less than ninety-nine years which is renewable; or

(3) Under a lease having a period of not less than seventy-five years to run from the date the mortgage is executed; or

(4) Under a lease executed by a governmental agency, an Indian, an Indian tribe, or such other lessor as the Commissioner may approve for the maximum term consistent with the legal authority for the execution of such lease, provided that the term of any such lease shall run for a period of not

less than 50 years from the date the mortgage is executed.

(b) The property constituting security for the mortgage must be held by an eligible mortgagor as herein defined and must at the time the mortgage is insured be free and clear of all liens other than that of such mortgage.

(68 Stat. 599; 12 U.S.C. 1715l)  [ 36 F.R. 24537, Dec. 22, 1971, as amended at 37 F.R. 1245, Jan. 27, 1972]

§ 207.24  Development of property.

(a) At the time the mortgage is insured the mortgagor shall be obligated to construct and complete new housing accommodations on the mortgaged property, designed principally for residential use, conforming to standards satisfactory to the Commissioner, and consisting of not less than eight rental dwelling units on one site and may be detached, semi-detached, or row houses, or multi-family structures; except that the Commissioner may insure a mortgage on a completed project constructed pursuant to a Commitment to Insure upon Completion, or

(b) At the time the mortgage is insured there shall be located on the mortgaged property a building or buildings, which, upon completion of proposed improvements, shall constitute a single project and provide housing accommodations designed principally for residential use, conforming to standards satisfactory to the Commissioner, and containing at least eight rental dwelling units so located in relation to one another as to effect a substantial improvement of housing standards and conditions in the neighborhood; and in either case such dwelling and other improvement if any, must not violate any material zoning or deed restrictions applicable to the protest site, and must comply with all applicable building and other governmental regulations; and any project may include such commercial and community facilities as the Commissioner deems adequate to serve the occupants.

ADJUSTMENT OF MORTGAGE AMOUNT

§ 207.25  Certification of cost requirements.

(a) Prior to initial endorsement of the mortgage for insurance, the mortgagor, the mortgagee, and the Commissioner shall enter into an agreement in form and content satisfactory to the Commissioner for the purpose of precluding any excess of mortgage proceeds over statu-

409

tory limitations. Under this agreement, the mortgagor shall disclose its relationship with the builder, including any collateral agreement, and shall agree:

(1) To enter into a construction contract, the terms of which shall depend on whether or not there exists an identity of interest between the mortgagor and the builder.

(2) To execute a Certificate of Actual Costs, upon completion of all physical improvements on the mortgaged property.

(3) To apply in reduction of the outstanding balance of the principal of the mortgage any excess of mortgage proceeds over statutory limitations based on actual cost.

(b) The provisions of paragraph (a) of this section relating to disclosure and the requirement for a construction contract shall not apply where the mortgagor is the general contractor.

§ 207.26  Form of contract.

The form of contract between the mortgagor and builder shall be determined in accordance with the following

(a) If it is established to the satisfaction of the Commissioner that neither the mortgagor nor any of the officers, directors, or stockholders of the mortgagor have any interest in the builder or contractor, there may be used a lump sum form of contract providing for payment of a specified amount.

(b) If it is determined by the Commissioner that the mortgagor, its officers, directors or stockholders have any interest, financial or otherwise, in the builder or contractor, the form of contract shall provide for payment of the actual cost of construction, not to exceed an upset price and may provide for payment of a builder's fixed fee in addition thereto. The builder's fixed fee shall not exceed a reasonable allowance therefor as established by the Commissioner, in accordance with customary practices in the area.

(c) Where a cost plus form of contract is used, the mortgagor shall submit along with its certification of actual cost a certification of the general contractor, in a form prescribed by the Commissioner, as to all actual costs paid for labor, materials and subcontract work under the general contract exclusive of the builder's fee and any kickbacks, rebates, trade discounts, or other similar payments to the general contractor, the mortgagor, or

any of its officers, directors, stockholders or partners.

(d) Where it is determined by the Commissioner that an identity of interest exists between the mortgagor or any of its officers, directors, stockholders or partners and any subcontractor, material supplier, or equipment lessor, the mortgagor may be required by the Commissioner to submit a certification of actual cost by such subcontractor, material supplier, or equipment lessor, in a form prescribed by the Commissioner, as to all actual costs paid for labor, materials, subcontracts and overhead exclusive of any kickbacks, rebates, trade discounts, or other similar payments to the general contractor, the mortgagor, or any of its officers, directors, stockholders or partners. Where the use of a cost plus form of contract is required by the Commissioner and it is determined by the Commissioner that an identity of interest exists between the general contractor and, any subcontractor, material supplier, or equipment lessor, the mortgagor may be required by the Commissioner to submit a certification of actual cost by such subcontractor, material supplier, or equipment lessor.

§ 207.26a  Disposition of general contractor's holdback.

In those cases in which a conditional commitment has been issued after March 4, 1977, and there is no identity of interest between the mortgagor and general contractor, the following provisions shall be applicable:

(a) The construction contract, whether it be lump sum or cost-plus, shall contain provisions whereby the mortgagor and contractor agree that the general contractor:

(1) Shall submit to the mortgagor, on a monthly basis, a requisition for payment equal to the total value of classes of work acceptably completed plus the value of materials and equipment not incorporated in the work but delivered to, and suitably stored at, the site, less prior payments made to the general contractor;

(2) Shall accept, for each and every requisition, 90 percent of the amount approved for payment, and shall agree that the remaining 10 percent shall be retained by the mortgagee to be deposited in an escrow account when the construction of the project has been substantially completed, with the exception of minor incomplete on-site construction

410

# EXHIBIT A
# (Part II)

items, and the following requirements have been met:

(i) All work under the construction contract, requiring inspection by municipal or other governmental authorities having jurisdiction, has been inspected and approved by such authorities and by the rating or inspection organization, bureau, association or office having jurisdiction; (ii) all required certificates of occupancy or other approvals, with respect to all units of the project, have been issued by State or local governmental authorities having jurisdiction, except that, in the event the mortgagor fails or refuses to file requests for issuance of such certificates, this requirement will be satisfied upon the Commissioner's finding that such certificates or approvals would be forthcoming but for the mortgagor's failure to request their issuance; (iii) permissions to occupy for all units of the project have been issued by the Commissioner; and (iv) in the event a cost-plus form of contract has been used, that the mortgagee has been notified by the HUD field office that the mortgagor has filed the "Contractor's Certificate of Actual Cost" with the Commissioner, except that, if the mortgagor fails or refuses to file such a certificate within a reasonable time, the general contractor's direct submission of the certificate of actual cost may be the basis for the HUD field office notification and the establishment of the escrow.

(3) Shall be entitled to the funds in the escrow account upon compliance with the terms of the Escrow Agreement which shall contain the conditions for release of the escrow account to the general contractor.

(b) The building loan agreement shall provide that: (1) The mortgagor shall request monthly from the mortgagee an advance of mortgage proceeds for construction items in the amount of the total value of classes of work acceptably completed plus the value of materials and equipment not incorporated in the work but delivered to, and suitably stored at, the site, less prior advances; (2) The mortgagor shall accept, for each and every advance, 90 percent of the amount of advance approved; (3) The mortgagee shall retain the remaining 10 percent of each approved advance; (4) The mortgagee shall transfer the 10 percent holdback for each advance, minus an amount that is one and one-half times the cost estimated by the Commissioner that is

required for the completion of any minor incomplete on-site construction items, to an escrow account when the general contractor completes the construction as determined by the Commissioner and meets the requirements set forth in paragraphs (a)(2)(i), (ii) and (iii); and (a)(2)(i), (ii), (iii) and (iv) of this section for a general contractor who has executed a lump sum form of contract or cost-plus form of contract, respectively.

(5) The 10 percent holdback shall not be construed as an advance from mortgage proceeds by the mortgagee until the mortgagee places the funds in an escrow account in accordance with paragraph (b)(4) of this section; and

(6) The mortgagee and mortgagor agree that, notwithstanding the inclusion in the building loan agreement of the provisions contained in paragraphs (b)(1) through (5) of this section, the mortgagee is not required to make any advance of mortgage proceeds if the mortgagor is in default under the building loan agreement, other than the advance of the 10 percent holdback in accordance with paragraph (b)(4) of this section, and, except as altered by the provisions of this paragraph, the rights and obligations of the mortgagee and mortgagor under the building loan agreement shall not be affected.

(c) An Escrow Agreement shall be established for the purposes set forth in paragraphs (a) and (b) of this section and the depository under such agreement shall be either the mortgagee or a party designated by the mortgagee. The agreement shall contain provisions for the release of the escrow fund which shall include the requirement that the general contractor submit its certificate of actual cost for approval by the Commissioner and that the certificate be approved by the Commissioner before the contractor shall be entitled to the fund. If the mortgagor and general contractor have entered into a lump sum contract, the requirement for the certificate of actual cost shall not be applicable. The Escrow Agreement shall provide that the depository will:

(1) Release the funds upon request of the general contractor and approval of the Commissioner;

(2) Invest the funds in an interest bearing account, if the mortgagor and general contractor have so agreed, which interest shall be paid to the general con-

HeinOnline -- CFR 411 1977

tractor when the escrowed funds are released to the general contractor:

(3) Release to the general contractor only that portion of the escrowed funds which do not exceed the amount of costs approved by the Commissioner on the "Contractor's Certificate of Actual Cost", or, in the case of a general contractor which has entered into a lump sum contract, an amount, which when added to payments already received, does not exceed the amount of the lump sum contract. In the event the contractor has not completed construction of the project within the time provided in the construction contract, there shall be deducted from the escrow fund an amount which the Commissioner determines equals the liquidated damages as provided in the construction contract.

(4) Disburse any remaining amount in the escrow fund in accordance with the terms of the escrow agreement; and

(d) The mortgagee's request for approval by the Commissioner of an advance for construction items shall contain a provision that such approval by the Commissioner shall constitute approval for mortgage insurance of the 10 percent holdback retained · by the mortgagee when the retained funds are placed in an escrow account in accordance with this section. The mortgage insurance on the funds retained by the mortgagee shall be effective on the date the funds are transferred to the escrow account.

(e) For the purposes of this section, "substantial completion" shall mean that the Commissioner has issued a final inspection report and that the Commissioner has determined that the contractor has completed the project in accordance with the terms of the construction contract.

[42 FR 764, Jan. 4, 1977; 42 FR 2954, Jan. 14, 1977]

EFFECTIVE DATE NOTE: Section 207.26a becomes effective June 4, 1977. See 42 FR 13112, Mar. 9, 1977.

## § 207.27   Certificates of actual cost.

(a) The mortgagor's certificate of actual cost, in a form prescribed by the Commissioner, shall be submitted upon completion of the physical improvements to the satisfaction of the Commissioner and prior to final endorsement. The certificate shall show the actual cost to the mortgagor, after deduction of any kickbacks, rebates, trade discounts, ·or other similar payments to the mortgagor,

or to any of its officers, directors, stockholders, or partners, of:

(1) The construction contract, where the mortgagor and the general contractor are separate entities, or the construction of the project where the mortgagor is the general contractor and there is no such contract. In the case of a lump sum contract, the amount shown in the certificate shall include all payments under the contract;

(2) In the case of a cost-plus-fixed-fee contract or where the mortgagor is the general contractor, the amount shown in the certificate shall include such allowance of general overhead items as are acceptable to the Commissioner plus a reasonable allowance for the builder's profit as established by the Commissioner;

(3) Architect's fee;

(4) Off-site public utilities and streets not included in the general contract;

(5) Organizational and legal work; and

(6) Other items of expense approved by the Commissioner.

(b) A builder receiving a fixed fee under a cost plus contract shall certify in a form prescribed by the Commissioner as to all actual cost paid for labor, materials, and subcontract work under the general contract exclusive of the builder's fixed fee less any kickbacks, rebates, trade discounts, or other similar payments to the builder or mortgagor or any of its officers, directors or stockholders.

(c) The mortgagor shall keep and maintain adequate records of all cost of any construction or other cost items not representing work under the general contract and, in the case of a cost plus contract, shall require the builder to keep similar records and, upon request by the Commissioner, shall make available for examination such records including any collateral agreements.

(d) The Certificate of Actual Cost shall be verified by an independent Certified Public Accountant or independent public accountant in a manner acceptable to the Commissioner.

## § 207.28   Adjustment resulting from cost certification.

Upon receipt of the mortgagor's certification of actual cost there shall be added to the total amount thereof the Commissioner's estimate of the fair market value of any land included in the mortgage security and owned by the

mortgagor in fee such value being prior to the construction of the improvements. In the event the land is held under a leasehold or other interest less than a fee, the cost, if any, of acquiring the leasehold or other interest is considered an allowable expense which may be added to actual cost provided that in no event such amount is in excess of the fair market value of such leasehold or other interest exclusive of proposed improvements. If the principal obligation of the mortgage exceeds the applicable statutory percentage of this total amount, the mortgage shall be reduced by the amount of such excess prior to final endorsement for insurance.

§ 207.29  Rehabilitation projects.

In the event the mortgage is to finance repair or rehabilitation, the mortgagor's actual cost of such repair or rehabilitation may include the items of expense permitted for new construction in accordance with either paragraph (a) or paragraph (b) of § 207.27 and the applicable cost certification procedure described therein will be required; provided such mortgage shall be subject to the following limitations:

(a) *Property held in fee.* If no part of the proceeds is to be used to finance the purchase of the land or structures involved, the mortgage shall be reduced to an amount not to exceed 100 percent of the approved cost of the completed repair or rehabilitation.

(b) *Property subject to existing mortgage.* If the insured mortgage is to include the cost of refinancing an existing mortgage acceptable to the Commissioner, the amount of the existing mortgage or 90 percent of the Commissioner's estimate of the fair market value of land and existing improvements prior to repair or rehabilitation, whichever is the lesser, shall be added to the actual cost of the repair or rehabilitation. If the principal obligation of the insured mortgage exceeds the total amount thus obtained, the mortgage shall be reduced by the amount of such excess, prior to final endorsement for insurance.

(c) *Property to be acquired.* If the mortgage is to include the cost of land and improvements, and the purchase price thereof is to be financed with part of the mortgage proceeds, the purchase price, or the Commissioner's estimate of the fair market value of land and existing improvements prior to repair or rehabilitation, whichever is the lesser,

shall be added to the actual cost of the repair or rehabilitation. If the principal obligation of the insured mortgage exceeds the applicable statutory percentage of the total amount thus obtained, the mortgage shall be reduced by the amount of such excess, prior to final endorsement for insurance.

§ 207.30  Requisites of agreement and certification.

(a) Any agreement, undertaking, statement or certification required by § 207.27 shall specifically state that it has been made, presented, and delivered for the purpose of influencing an official action of the Federal Housing Administration, and of the Federal Housing Commissioner, and may be relied upon by the Commissioner as a true statement of the facts contained therein.

(b) Upon the Commissioner's approval of the mortgagor's certification as required by § 207.27 such certification shall be final and incontestable except for fraud or material misrepresentation on the part of the mortgagor.

OTHER ELIGIBLE MORTGAGES

§ 207.31  Eligibility of miscellaneous type mortgages.

(a) A mortgage covering five or more rental units and which meets the requirements of this subpart, except as modified by this section, shall be eligible for insurance under this subpart.

(b) The mortgage may be accepted for insurance if—

(1) Executed in connection with the sale by the Government, or any agency or official thereof, of any housing acquired or constructed under Public Law 849, Seventy-sixth Congress, as amended; Public Law 781, Seventy-sixth Congress, as amended; or Public Laws 9, 73, or 353, Seventy-seventh Congress, as amended (including any additional property acquired, held, or constructed in connection with such housing or to serve the inhabitants thereof); or

(2) Executed in connection with the sale by the Public Housing Administration, or by any public housing agency with the approval of the said Administration, of any housing including any additional property acquired, held, or constructed in connection with such housing or to serve the inhabitants thereof) owned or financially assisted pursuant to the provisions of Public Law 671, Seventy-sixth Congress; or

413

§ 207.31a        Title 24—Housing and Urban Development

(3) Executed in connection with the sale by the Government, or any agency or official thereof, or any of the so-called Greenbelt towns, or parts thereof, including projects, or parts thereof, known as Greenhills, Ohio; Greenbelt, Maryland; and Greendale, Wisconsin, developed under the Emergency Relief Appropriation Act of 1935; or of any of the village properties or employee's housing under the jurisdiction of the Tennessee Valley Authority; or of any housing under the jurisdiction of the Department of the Interior located within the town area of Coulee Dam, Washington, acquired by the United States for the construction, operation, and maintenance of Grand Coulee Dam and its appurtenant works or of any permanent housing under the jurisdiction of the Department of the Interior constructed under the Boulder Canyon Project Act of December 21, 1928, as amended and supplemented, located within the Boulder City municipal area; or

(4) Executed in connection with the sale by the Government, or any agency or official thereof, of any housing (including any property acquired, held, or constructed in connection therewith or to serve the inhabitants thereof) pursuant to the Atomic Energy Community Act of 1955, as amended: *Provided,* That such insurance shall be issued without regard to any preferences or priorities except those prescribed by the National Housing Act or the Atomic Energy Community Act of 1955, as amended; or

(5) Executed in connection with the sale by a State or municipality, or any agency, instrumentality, or political subdivision of either, of a project consisting of any permanent housing (including any property acquired, held or constructed in connection therewith or to serve the inhabitants thereof), constructed by or on behalf of such State, municipality, agency, instrumentality or political subdivision, for the occupancy of veterans (as defined in § 203.12) their families and others: *Provided,* That in no case may the principal obligation of a mortgage referred to in this subparagraph exceed 90 percent of the appraised value of the mortgaged property; or

(6) Executed in connection with the first resale, within two years from the date of its acquisition from the Government, of any portion of a project or property of the character described in subparagraphs (1), (2), (3), and (4) of this paragraph.

(c) For the purposes of this section, an eligible mortgagor is defined as a person or legal entity acceptable to the Commissioner. Such a mortgagor may, in the discretion of the Commissioner, be (1) uncontrolled or (2) controlled in such degree and manner as the Commissioner may find desirable under the circumstances.

§ 207.31a   Eligibility of mortgages covering housing in certain neighborhoods.

(a) A Mortgage financing the repair, rehabilitation or construction of property located in an older declining urban area shall be eligible for insurance under this subpart subject to compliance with the additional requirements of this section.

(b) The mortgage shall meet all of the requirements of this subpart, except such requirements (other than those relating to labor standards and prevailing wages) as are judged to be not applicable on the basis of the following determinations to be made by the Commissioner:

(1) That the conditions of the area in which the property is located prevent the application of certain eligibility requirements of this subpart.

(2) That the area is reasonably viable, and there is a need in the area for adequate housing for families of low and moderate income.

(3) That the mortgage to be insured is an acceptable risk.

(c) Mortgages complying with the requirements of this section shall be insured under this subpart pursuant to section 223(e) of the National Housing Act. Such mortgages shall be insured under and be the obligation of the Special Risk Insurance Fund.

§ 207.32   Eligibility of refinancing transactions.

A mortgage given to refinance an existing insured mortgage covering five or more rental units may be insured under this subpart pursuant to section 223(a) (7) of the act. The new mortgage shall be limited in amount and in term as follows:

(a) Except as provided in paragraph (b), the principal of the new mortgage shall not exceed the lowest of these amounts:

(1) The original principal amount of the existing insured mortgage.

(2) The unpaid principal amount of the existing insured mortgage, to which may be added—

414

(i) The outstanding indebtedness incurred in connection with capital improvements made to the property which are acceptable to the Commissioner.

(ii) The costs, as determined by the Commissioner, of capital improvements, upgrading or additions required to be made to the property.

(iii) Loan closing charges.

(3) 90 percent of the Commissioner's estimate of the value of the property after completion of the repairs, improvements or additions to the property.

(b) Where the mortgage to be refinanced is one of several insured mortgages covering properties which are part of a single development and the proceeds of the refinanced mortgage are to be applied to the delinquent indebtedness of one or more of the insured mortgages in such development, the principal amount of the new mortgage shall not exceed the original principal amount of the existing insured mortgage. For purposes of this paragraph, single development shall mean adjacent properties owned by the same mortgagor or an affiliate mortgagor, as determined by the Commissioner.

(c) The term of the new mortgage shall not exceed the unexpired term of the existing mortgage, except that it may have a term of not more than 12 years in excess of the unexpired term of the existing mortgage in any case in which the Commissioner determines that the insurance of the mortgage for an additional term will inure to the benefit of the applicable insurance fund, taking into consideration the outstanding insurance liability under the existing insured mortgage.

§ 207.32a  Eligibility of mortgages on existing projects.

Notwithstanding the generally applicable requirement that mortgages insured under this subpart be limited to projects to be constructed or substantially rehabilitated after commitment for mortgage insurance, a mortgage executed in connection with the purchase or refinancing of an existing multifamily housing project containing eight or more rental units may be insured under this subpart pursuant to section 223(f) of the Act. A mortgage insured pursuant to this section shall meet all other requirements of this subpart except as modified by this section and shall be limited as to amount, terms, and conditions for insurance as follows:

(a) *Application, commitment, inspection and required fees*—(1) *Application.* An application for a conditional or firm commitment for insurance of a mortgage on a project shall be submitted by the sponsor and an approved mortgagee. Such application shall be submitted to the local HUD office on an FHA approved form. No application shall be considered unless accompanied by the exhibits required by the form. An application may, at the option of the applicant, be submitted for a firm commitment omitting the conditional commitment stage. An application may be made only for a commitment which provides for the insurance of the mortgage upon completion of the improvements.

(2) *Application fee—conditional commitment.* An application-commitment fee of $2 per thousand dollars of the requested mortgage amount shall accompany an application for conditional commitment.

(3) *Application fee—firm commitment.* An application for firm commitment shall be accompanied by an application-commitment fee of $3 per thousand dollars of the requested mortgage amount to be insured less the amount of any fee previously received for a conditional commitment.

(4) *Inspection fee.* No inspection fee will be required.

(b) *Maximum mortgage amounts—general.* In addition to the limitations in paragraphs (c) and (d) of this section a mortgage may not involve a principal obligation in excess of the lesser of the following:

(1) 85 percent (90 percent if the project meets the eligibility requirements contained in paragraph (k) of this section) of the Commissioner's estimate of the value of the project;

(2) The total of the amounts per family dwelling unit (excluding exterior land improvements as defined by the Commissioner) depending on the number of bedrooms which may be:

$19,500 without a bedroom.
$21,600 with one bedroom.
$25,800 with two bedrooms.
$31,800 with three bedrooms.
$36,000 with four or more bedrooms.

(i) *Increased mortgage amount—elevator type structures.* In order to compensate for the higher costs incident to construction of elevator type structures of sound standards of construction and design, the Commissioner may increase

415

the dollar amount limitations per family unit as provided in paragraph (b)(2) of this section, not to exceed:

$22,500 without a bedroom.
$25,200 with one bedroom.
$30,900 with two bedrooms.
$38,700 with three bedrooms.
$43,758 with four or more bedrooms.

(ii) *Increased mortgage amount—high cost areas.* (A) In any geographical area where the Commissioner finds cost levels so require, the Commissioner may increase, by not to exceed 50 percent, the dollar amount limitations set forth in paragraphs (b)(2) and (b)(2)(i) of this section.

(B) If the Commissioner finds that because of high costs in Alaska, Guam, or Hawaii it is not feasible to construct dwellings without the sacrifice of sound standards of construction, design, and livability within the limitations of maximum mortgage amounts provided in this section, the principal obligation of mortgages may be increased in such amounts as may be necessary to compensate for such costs but not to exceed in any event the maximum, including high cost area increases, if any, otherwise applicable by more than one-half thereof.

(c) *Maximum mortgage amounts— property to be acquired.* If the project is to be acquired by the mortgagor and the purchase price is to be financed with the insured mortgage, the maximum mortgage amount shall not exceed 85 percent (90 percent if the project meets the eligibility requirements contained in paragraph (k) of this section) of the cost of acquisition as determined by the Commissioner. The cost of acquisition shall consist of the following items, the eligibility and amounts of which must be determined by the Commissioner:

(1) Purchase price as indicated in the purchase agreement,

(2) An amount for the initial deposit to the Reserve Fund for Replacements,

(3) Reasonable and customary legal, organizational, title and recording expenses, and fees including discounts charged by the mortgagee,

(4) The estimated repair cost, if any, and

(5) Architect's, municipal inspection and/or engineering fees.

(d) *Maximum mortgage amounts— property to be refinanced.* If property is to be refinanced by the insured mortgage without a change of ownership, or if property is sold to a purchaser who has

an identity of interest with the seller and the purchase is to be financed with the insured mortgage, then the maximum mortgage amount shall not exceed the greater of:

(1) 70 percent of the Commissioner's estimate of value of the project, or

(2) The cost to refinance the existing indebtedness which will consist of the following items, the eligibility and amounts of which must be determined by the Commissioner:

(i) The amount required to pay off the existing indebtedness,

(ii) An amount for the initial deposit for the Reserve Fund for Replacements,

(iii) Reasonable and customary legal, organizational, title and recording expenses, and fees including discounts charged by the mortgagee,

(iv) The estimated repair cost, if any, and

(v) Architect's, municipal inspection, and/or engineering fees.

(e) *Maturity.* The term of the mortgage shall not be less than 10 years, nor shall it exceed the lesser of 35 years (40 years if the project meets the eligibility requirements contained in paragraph (k) of this section) or 75 percent of the estimated remaining economic life of the physical improvements. The term of the mortgage shall begin on the first day of the second month following the date of initial-final endorsement of the mortgage for insurance.

(f) *Eligible property.* A mortgage given to purchase or refinance an existing project shall be eligible for insurance if such project contains at least eight dwelling units. The project shall have attained sustaining occupancy (occupancy that would produce rental income sufficient to pay operating expenses, annual debt service and reserve fund for replacement requirements), as determined by the Commissioner, prior to endorsement of the mortgage for insurance, or the mortgagor shall provide an operating deficit fund at the time of endorsement for insurance, in an amount, and under an agreement, approved by the Commissioner. In addition to the other requirements in this section, projects, except those which meet the requirements of paragraph (k) of this section, must also meet one of the following requirements:

(1) Prior to the time of filing an application for mortgage insurance, the project shall have been fully completed and at least three years must have elapsed from the date of completion, or initial

416

**Chap. II—Office of Assistant Secretary for Housing**                    **§ 207.32a**

occupancy, as determined by the Commissioner, whichever is later, or

(2) Prior to June 30, 1974, construction of the project shall have commenced, and the project shall have been fully completed prior to June 30, 1976, and after completion of the project an application for insurance shall have been filed prior to June 30, 1976.

(g) *Refinancing eligible property in older, declining urban areas.* In addition to meeting the requirement in paragraph (f) (1) of this section, and the other requirements of this section, an existing project to be refinanced in an older, declining urban area, shall comply with the following conditions:

(1) The maximum mortgage amount shall be limited by the lesser of paragraphs (b) (1), (b) (2), or (d) (2) of this section.

(2) The refinancing shall be used to lower the monthly debt service only to the extent necessary to assure the continued economic viability of the project as determined by the Commissioner taking into account any rent reductions to be implemented by the mortgagor; and

(3) The mortgagor shall agree that, during the mortgage term, no rental increases shall be made except those which are necessary to offset actual and reasonable operating expense increases or other necessary expense increases approved by the Commissioner.

(h) *Occupancy requirements.* The requirements contained in § 207.20(a) shall not apply to a mortgage insured pursuant to a commitment issued in accordance with this section if the Commissioner determines that the project is intended primarily for occupancy by the elderly or handicapped and is not compatible with occupancy by families with children.

(i) *Labor standards and prevailing wage requirements.* The requirements of § 207.19(d) (1), (4), and (5) shall not be applicable to mortgages insured pursuant to a commitment issued in accordance with this section.

(j) *Secondary financing.* (1) When a loan is made to finance the purchase of an existing multifamily housing project, the mortgagor may not have any additional obligations in connection with the transaction which exceed the lesser of:

(i) Seven and one-half percent (7½%) of the Commissioner's estimate of value, or

(ii) Seven and one-half percent (7½%) of the cost of acquisition as defined in paragraph (c) of this section.

(2) When a loan is made to refinance an existing multifamily housing project, the mortgagor may not have any additional obligations in connection with the transaction which exceed the lesser of:

(i) Seven and one-half percent (7½%) of the Commissioner's estimate of value, or

(ii) Fifty percent of the difference between the cost to refinance as defined in paragraph (d) (2) of this section and the maximum mortgage amount as determined by the Commissioner.

(3) The additional obligations, if any, provided for in paragraphs (j) (1) and (2) of this section shall be represented by promissory notes on a form approved by the Commissioner. Such notes shall not be due and payable until the maturity date of the mortgage to be insured pursuant to this section, but may be prepaid from surplus cash as that term is defined in § 207.19(b) and in accordance with the conditions prescribed in the Regulatory Agreement between the mortgagor and the Commissioner.

(4) For those projects which meet the eligibility requirements contained in paragraph (k) of this section, any additional obligations on the project in connection with the insured transaction shall be in an amount approved by the Commissioner and represented by such credit and security instruments as are approved by the Commissioner.

(k) *Additional eligibility requirements for a mortgage refinancing a project financed with State or local assistance.* Projects which were constructed through State or local assistance shall be entitled to the benefits of the special eligibility provisions contained in this section by meeting the following additional requirements:

(1) Construction of the project must have commenced before December 31, 1975, and the project shall have been fully completed prior to January 1, 1978, and after completion of the project, an application for insurance shall have been filed prior to January 1, 1978.

(2) The project shall have been constructed under a State or local program providing assistance through loans, loan insurance or tax abatement, which form of assistance shall be approved by the Commissioner.

(3) The mortgage which is to be insured on the project is part of a portfolio

417

of mortgages, all of which have been approved for mortgage insurance by the Commissioner. The Commissioner, by agreement with the State or local government, or agency thereof, shall determine the size and amount of an eligible portfolio, and the conditions under which the portfolio may be increased or decreased, including the conditions under which the portfolio may be increased after a claim for insurance benefits has been paid by the Commissioner.

(4) The Commissioner has entered into an agreement with a State or local government, or agency thereof, pursuant to a State or local program, whereby the State has appropriated money, or money will be made available through other sources approved by the Commissioner, which shall be placed in a special fund to be used to reimburse the Commissioner in an amount not less than one-half of the insurance claims which the Commissioner pays on defaulted mortgages within all approved portfolios: *Provided, however,* That such payments shall continue until the total amount paid by the State or local government, or agency thereof, to the Commissioner on each approved portfolio equals a specified percentage of each such portfolio, as approved by the Commissioner, but in no event less than 5 percent of the outstanding principal balances of the mortgages in an approved portfolio and the mortgages removed from the portfolio through the payment of insurance claims. For the purpose of this paragraph, "outstanding principal balance" due on a mortgage shall be that amount which would be due according to the amortization schedule without taking into account prepayments or delinquencies. The payments to the Commissioner by the State or local government, or agency thereof, shall commence on the date of the first claim paid by the Commissioner on a mortgage in a portfolio and shall continue on each and every claim paid thereafter until the State or local government, or agency thereof, has reached the maximum payment set forth in the agreement. The State or local government, or agency thereof, shall agree that the special fund established to reimburse the Commissioner for payment of claims shall remain in existence until payments to the Commissioner have reached the maximum amount specified in the agreement. The agreement shall also contain assurances by the State or

local government, or agency thereof, that State law provides that:

(i) The projects securing the mortgages in each portfolio shall not be subject to rent controls by the State, or a political subdivision thereof, or by any authority regulating rents pursuant to State or local law, and

(ii) Any tax abatement or exemption in effect, or established, at the time of application for mortgage insurance shall continue so long as the mortgage is insured or held by the Commissioner, or the project is owned by the Commissioner.

(5) For those projects in which the owner has entered into a contract with the Commissioner for interest reduction payments pursuant to the proviso in Section 236(b) of the National Housing Act, the parties must agree to the modification of the interest reduction contract to reflect changes necessitated by insurance of a mortgage on the project pursuant to this section.

(6) For those projects in which the mortgagor is a nonprofit cooperative ownership housing corporation or nonprofit cooperative ownership housing trust, the permanent occupancy of the dwellings of which is restricted to members of such corporation or to beneficiaries of such trust, the mortgagor must be regulated or supervised under State laws or by political subdivisions of States, or agencies thereof. For projects which meet this requirement, the term "tenant" as used in this subpart shall mean a member of a cooperative, the term "rental charge" shall mean the charges under the occupancy agreement of members of the cooperative, and the term "rental unit" shall mean "dwelling unit."

[40 FR 43899, Sept. 24, 1975, as amended at 41 FR 12224, Mar. 24, 1976; 41 FR 41880, Sept. 23, 1976; 41 FR 45828, Oct. 18, 1976]

§ 207.33    Eligibility of mortgages on mobile home courts or parks.

(a) All of the provisions of this subpart shall apply to insurance on mobile home courts or parks, except as provided in this section. All references in this subpart to housing for rent or sale shall mean the rental of spaces for the accommodation of mobile homes, and such appurtenances thereto as may have been approved by the Commissioner.

(b) A mortgage on a mobile home court or park may involve a principal obligation in an amount to be determined as follows:

418

(1) An amount not exceeding the lesser of $3,900 per space (as defined by the Commissioner), or 90 percent of the estimated value of the property after the improvements are completed.

(2) In any geographical area where the Commissioner finds cost levels so require, the Commissioner may increase by not to exceed 50 percent, the $3,900 limitation set forth in paragraph (b)(1) of this section.

(3) If the Commissioner finds that because of high costs in Alaska, Guam, or Hawaii it is not feasible to construct mobile home courts or parks without the sacrifice of sound standards of construction, design, and livability within the limitations of maximum mortgage amounts provided in this paragraph, the principal obligation of mortgages may be increased in such amounts as may be necessary to compensate for such costs, but not to exceed in any event the maximum, including high cost area increases otherwise applicable, by more than one-half thereof.

(c) A mortgage on a mobile home court or park is not subject to the provisions of § 207.4, except that the provisions of § 207.4(e) (relating to a reduction in mortgage amout where the mortgage is on a leasehold estate) and the provisions of § 207.4(f) (relating to loans to cover 2-year operating losses) shall be applicable.

(d) A mortgage on a leasehold estate shall be eligible for insurance only if the real estate is held:

(1) On the interest of the lessee under a lease for not less than 99 years which is renewable; or

(2) Under a lease having a period of not less than 50 years to run from the date the mortgage is executed.

(e) [Reserved]

(f) A mortgage on a mobile home court or park shall have a term not in excess of 20 years from the date of insurance, except that such mortgage may have a longer term, not in excess of 40 years, if the Commissioner determines that the location of the project is not inconsistent with comprehensive planning for the area where such planning exists, or can reasonably be expected to be consistent with desirable growth patterns in the foreseeable future.

(g) [Reserved]

(h) At the time a mortgage is insured on a mobile home court or park, the mortgagor shall have constructed and completed, or shall have rehabilitated and completed, pursuant to a commitment to insure upon completion, or shall be obligated to construct and complete, or to rehabilitate and complete pursuant to a commitment to insure advances, such court or park, designed principally for rental use for mobile homes, and conforming to standards, specifications, plans and requirements satisfactory to the Commissioner.

(i) The references in §§ 207.25 to 207.29 to "statutory limitation" and "statutory percentage" shall mean the ratio of loan to value limitation set forth in paragraph (b) of this section.

[36 FR 24537, Dec. 22, 1971, as amended at 39 FR 32435, Sept. 6, 1974; 41 FR 41880, Sept. 23, 1976]

§ 207.34   Reinsurance of Commissioner-held mortgages.

The Commissioner may insure under this part, without regard to any limitation upon eligibility contained in this subpart, any mortgage assigned to him in connection with payment under a contract of mortgage insurance, or executed in connection with a sale by him of any property acquired under any section or title of the Act.

### TITLE

§ 207.35   Eligibility of title.

In order for the mortgaged property to be eligible for insurance, the Commissioner must determine that marketable title thereto is vested in the mortgagor as of the date the mortgage is filed for record. The title evidence will be examined by the Commissioner and the original endorsement of the credit instrument for insurance will be evidence of its acceptability.

§ 207.36   Title evidence.

(a) Upon insurance of the mortgage, the mortgagee shall furnish to the Commissioner a survey of the mortgaged property, satisfactory to him, and a policy of title insurance covering such property, as provided in subparagraph (1) of this paragraph. If, for reasons the Commissioner deems satisfactory, title insurance cannot be furnished, the mortgagee shall furnish such evidence of title in accordance with subparagraph (2), (3), or (4) of this paragraph, as the Commissioner may require. Any survey, policy of title insurance, or evidence of title required under this section shall be furnished without expense to the Commissioner. The types of title evidence are:

419

§ 207.36a    **Title 24—Housing and Urban Development**

(1) A policy of title insurance issued by a company and in a form satisfactory to the Commissioner. The policy shall name as the insureds the mortgagee and the Secretary of Housing and Urban Development, as their respective interests may appear. The policy shall provide that upon acquisition of title by the mortgagee or the Secretary, it will become an owner's policy running to the mortgagee or the Secretary, as the case may be.

(2) An abstract of title satisfactory to the Commissioner, prepared by an abstract company or individual engaged in the business of preparing abstracts of title, accompanied by a legal opinion satisfactory to the Commissioner, as to the quality of such title, signed by an attorney at law experienced in the examination of titles.

(3) A Torrens or similar title certificate.

(4) Evidence of title conforming to the standards of a supervising branch of the Government of the United States of America, or of any State or Territory thereof.

(b) The survey required by paragraph (a) of this section need not be furnished in connection with a project involving rehabilitation where the mortgage does not exceed $200,000.

EXTENSION OF TIME

§ 207.36a    **Actions by Commissioner.**

Where the mortgagee or lender has failed to take action within the period of time required in order to prevent the expiration of a commitment or in order to reopen an expired commitment, the Commissioner may extend such period and may retroactively reinstate or reopen such commitment.

§ 207.249    **Effect of amendments.**

The regulations in this subpart may be amended by the Commissioner at any time and from time to time, in whole or in part, but such amendment shall not adversely affect the interests of a mortgagee or lender under the contract of insurance on any mortgage or loan already insured and shall not adversely affect the interests of a mortgagee or lender on any mortgage or loan to be insured on which the Commissioner has made a commitment to insure.

**Subpart B—Contract Rights and Obligations**

§ 207.251    **Definitions.**

As used in this subpart:

(a) The term "Commissioner" means the Federal Housing Commissioner.

(b) The term "act" means the National Housing Act, as amended.

(c) The term "mortgage" means such a first lien upon real estate and other property as is commonly given to secure advances on, or the unpaid purchase price of, real estate under the laws of the State, district or territory in which the real estate is located, together with the credit instrument or instruments, if any, secured thereby. In any instance where an operating loss loan is involved, the term shall include both the original mortgage and the instrument securing the operating loss loan.

(d) The term "insured mortgage" means a mortgage which has been insured by the endorsement of the credit instrument by the Commissioner, or his duly authorized representative.

(e) The term "contract of insurance" means the agreement evidenced by such endorsement and includes the terms, conditions and provisions of this part and of the National Housing Act.

(f) The term "mortgagor" means the original borrower under a mortgage and its successors and such of its assigns as are approved by the Commissioner.

(g) The term "mortgagee" means the original lender under a mortgage its successors and such of its assigns as are approved by the Commissioner, and includes the holders of the credit instruments issued under a trust indenture, mortgage or deed of trust pursuant to which such holders act by and through a trustee therein named.

PREMIUMS

§ 207.252    **First, second and third premiums.**

The mortgagee, upon the initial endorsement of the mortgage for insurance, shall pay to the Commissioner a first mortgage insurance premium equal to one-half of one percent of the original face amount of the mortgage.

(a) If the date of the first principal payment is more than one year following the date of such initial insurance

420

endorsement, the mortgagee, upon the anniversary of such insurance date, shall pay a second premium equal to one-half of one percent of the original face amount of the mortgage. On the date of the first principal payment, the mortgagee shall pay a third premium equal to one-half of one percent of the average outstanding principal obligation of the mortgage for the following year which shall be adjusted so as to accord with such date and so that the aggregate of the said three premiums shall equal the sum of (1) one percent of the average outstanding principal obligation of the mortgage for the year following the date of initial insurance endorsement and (2) one-half of one percent per annum of the average outstanding principal obligation of the mortgage for the period from the first anniversary of the date of initial insurance endorsement to one year following the date of the first principal payment.

(b) If the date of the first principal payment is one year, or less than one year following the date of such initial insurance endorsement, the mortgagee, upon such first principal payment date, shall pay a second premium equal to one-half of one percent of the average outstanding principal obligation of the mortgage for the following year which shall be adjusted so as to accord with such date and so that the aggregate of the said two premiums shall equal the sum of (1) one percent per annum of the average outstanding principal obligation of the mortgage for the period from the date of initial insurance endorsement to the date of first principal payment and (2) one-half of one percent of the average outstanding principal obligation of the mortgage for the year following the date of the first principal payment.

(c) Where the credit instrument is initially and finally endorsed for insurance pursuant to a Commitment to Insure Upon Completion, the mortgagee on the date of the first principal payment shall pay a second premium equal to one-half of one percent of the average outstanding principal obligation of the mortgage for the year following such first principal payment date which shall be adjusted so as to accord with such date and so that the aggregate of the said two premiums shall equal the sum

of one-half of one percent per annum of the average outstanding principal obligation of the mortgage for the period from the date of the insurance endorsement to one year following the date of the first principal payment.

(d) Until the mortgage is paid in full, or until receipt by the Commissioner of an application for insurance benefits, or until the contract of insurance is otherwise terminated with the consent of the Commissioner, the mortgagee, on each anniversary of the date of the first principal payment, shall pay an annual mortgage insurance premium equal to one-half of one percent of the average outstanding principal obligation of the mortgage for the year following the date on which such premium becomes payable.

(e) The premiums payable on and after the date of the first principal payment shall be calculated in accordance with the amortization provisions without taking into account delinquent payments or prepayments.

(f) Premiums shall be payable in cash or in debentures at par plus accrued interest. All premiums are payable in advance and no refund can be made of any portion thereof except as hereinafter provided in this subpart.

§ 207.252a   Premiums — operating loss loans.

(a) The mortgagee, upon the insurance endorsement of the increase loan credit instrument covering the operating loss loan, shall pay to the Commissioner a first mortgage insurance premium of one-half of 1 percent of the original amount of the loan.

(b) The provisions of paragraphs (d), (e), and (f) of § 207.252 shall apply to operating loss loans.

§ 207.252b   Premiums—mortgages insured pursuant to section 223(f) of the Act.

(a) The mortgagee, upon the initial-final endorsement of the mortgage for insurance pursuant to a Commitment to Insure Upon Completion issued in accordance with § 207.32a, shall pay to the Commissioner a first mortgage insurance premium equal to one percent of the original face amount of the mortgage.

(b) The mortgagee, on the date of the first principal payment, shall pay a second premium equal to one percent of the

421

§ 207.253    Title 24—Housing and Urban Development

average outstanding principal obligation of the mortgage for the year following such first principal payment date which shall be adjusted as of that date so that the aggregate of the first and second premiums shall equal the sum of one percent per annum of the average outstanding principal obligation of the mortgage for the period from the date of the insurance endorsement to one year following the date of the first principal payment.

(c) The provisions of paragraphs (d), (e) and (f) of § 207.252 shall apply to mortgages insured pursuant to section 223(f) of the Act.

(Sec. 7(d), Department of Housing and Urban Development Act; (42 U.S.C. 3535(d)).) [40 FR 10177, Mar. 5, 1975]

§ 207.253    Termination by prepayment and voluntary termination.

All rights under the insurance contract and all obligations to pay future insurance premiums shall terminate on the following conditions:

(a) *Termination by prepayment.* Notice of the prepayment in full of the mortgage or loan shall be given to the Commissioner, on a form prescribed by the Commissioner, within 30 days from the date of prepayment. The insurance contract shall terminate, effective as of the date of prepayment. No adjusted premium charge shall be due the Commissioner on account of such termination by prepayment.

(b) *Termination by voluntary agreement.* Receipt by the Commissioner of a written request, by the mortgagor and mortgagee or lender for termination of the insurance on the mortgage or loan, on a form prescribed by the Commissioner, accompanied by the original credit instrument for cancellation of the insurance endorsement and the remittance of all sums to which the Commissioner is entitled. The termination shall become effective as of the date these requirements are met. No voluntary termination charge shall be due the Commissioner on account of such termination by voluntary agreement.

(c) Upon termination of the mortgage or loan insurance contract by a payment in full or by a voluntary termination, the Commissioner shall refund to the mortgagee or lender for the account of the mortgagor or borrower an amount equal to the pro rata portion of the current annual mortgage insurance premium

theretofore paid, which is applicable to the portion of the year subsequent to (1) the date of the prepayment or (2) the effective date of the voluntary termination of the contract of insurance.

(d) Notwithstanding any provision in the mortgage instrument, this section shall apply to all mortgage or loan insurance contracts terminated by either prepayment or voluntary termination where (1) the mortgage is prepaid in full or (2) the Commissioner receives a request for voluntary termination, on or after May 1, 1972.

[37 F.R. 8662, Apr. 29, 1972]

§ 207.253a    Termination of insurance contract.

(a) *Reason for termination.* The happening of any of the following events shall constitute an additional reason for terminating the contract of insurance in cases where the mortgagee has elected to convey the property to the Commissioner:

(1) The acquisition by the mortgagee of the mortgaged property without conveying it to the Commissioner.

(2) The acquisition of the property at the foreclosure sale by a party other than the mortgagee.

(3) The redemption of the property after foreclosure.

(4) Notice given by the mortgagee after the foreclosure and during the redemption period that it will not tender the property to the Commissioner.

(b) *Notice of termination.* No contract of insurance shall be terminated until the mortgagee has given written notice thereof to the Commissioner within 30 days from the happening of any one of the events set forth in paragraph (a) of this section.

(c) *Effective termination date.* The Commissioner shall notify the mortgagee that the contract of insurance has been terminated and the effective termination date. The termination shall be effective as of the date any one of the events set forth in paragraph (a) of this section occur.

(d) *Effect of termination.* Upon termination of the contract of insurance the obligation to pay any subsequent MIP shall cease and all rights of the mortgagor and mortgagee shall be terminated.

[36 FR 24537, Dec. 22, 1971, as amended at 37 FR 8662, Apr. 29, 1972]

422

INSURANCE ENDORSEMENT

## § 207.254  Insurance endorsement.

(a) *Initial endorsement.* The Commissioner shall indicate his insurance of the mortgage by endorsing the original credit instrument and identifying the section of the Act and the regulations under which the mortgage is insured and the date of insurance.

(b) *Final endorsement.* When all advances of mortgage proceeds have been made and all the terms and conditions of the commitment have been complied with to the satisfaction of the Commissioner, he shall indicate on the original credit instrument the total of all advances he has approved for insurance and again endorse such instrument.

(c) *Effect of endorsement.* From the date of initial endorsement, the Commissioner and the mortgagee or lender shall be bound by the provisions of this subpart to the same extent as if they had executed a contract including the provisions of this subpart and the applicable sections of the Act.

RIGHTS AND DUTIES OF MORTGAGEE UNDER THE CONTRACT OF INSURANCE

## § 207.255  Defaults.

(a) The following shall be considered a default under the terms of a mortgage insured under this subpart:

(1) Failure of the mortgagor to make any payment due under the mortgage; or

(2) Failure to perform any other covenant under the provisions of the mortgage, if the mortgagee, because of such failure, has accelerated the debt.

(b) In the case of an operating loss loan, the failure of the mortgagor to make any payment due under such loan or under the original mortgage shall be considered a default under both the loan and original mortgage.

(c) If such defaults as defined in paragraphs (a) and (b) of this section continue for a period of 30 days the mortgagee shall be entitled to receive the benefits of the insurance hereinafter provided.

(d) For the purposes of this section the date of default shall be considered as:

(1) The date of the first uncorrected failure to perform a covenant or obligation; or

(2) The date of the first failure to make a monthly payment which subsequent payments by the mortgagor are insufficient to cover when applied to the overdue monthly payments in the order in which they became due.

## § 207.256  Notice.

(a) If the default as defined in § 207.255 is not cured within the 30 day grace period, the mortgagee shall within 30 days thereafter notify the Commissioner in writing of such default.

(b) Notwithstanding the provision of § 207.255(a) (2), the mortgagee will be required to give notice in writing to the Commissioner of the failure of the mortgagor to comply with such covenant regardless of the fact the mortgagee may not have elected to accelerate the debt.
[36 FR 24537, Dec. 22, 1971, as amended at 39 FR 5767, Feb. 15, 1974]

## § 207.256a  Reinstatement of defaulted mortgage.

If after default and prior to the completion of foreclosure proceedings the mortgagor shall cure the default, the insurance shall continue as if a default had not occurred, provided the mortgagee gives written notice of reinstatement to the Commissioner.

## § 207.256b  Modification of mortgage terms.

(a) The mortgagor and the mortgagee may, with the approval of the Commissioner, enter into an agreement which extends the time for curing a default under the mortgage or modifies the payment terms of the mortgage.

(b) The Commissioner's approval of the type of agreement specified in paragraph (a) of this section shall not be given unless the mortgagor agrees in writing that, during such period as payments to the mortgagee are less than the amounts required under the terms of the original mortgage, it will hold in trust for disposition as directed by the Commissioner all rents or other funds derived from the property which are not required to meet actual and necessary expenses arising in connection with the operation of such property, including amortization charges under the mortgage.

(c) The Commissioner may exempt a mortgagor from the requirement of paragraph (b) of this section in any case where the Commissioner determines that such exemption does not jeopardize the interests of the United States.

**§ 207.257   Commissioner's right to require acceleration.**

Upon receipt of notice of violation of a covenant, as provided for in § 207.256 (b), or otherwise being apprised thereof, the Commissioner reserves the right to require the mortgagee to accelerate payment of the outstanding principal balance due in order to protect the interests of the Federal Housing Commissioner.

**§ 207.258   Insurance claim requirements.**

(a) *Alternative election by mortgagee.* When the mortgagee becomes eligible to receive mortgage insurance benefits pursuant to § 207.255(c), it shall, within 45 days thereafter, give the Commissioner written notice of its intention to file an insurance claim and of its election either to assign the mortgage to the Commissioner, as provided in paragraph (b) of this section, or to acquire and convey title to the Commissioner, as provided in paragraph (c) of this section.

(b) *Assignment of mortgage to Commissioner.* If the mortgagee elects to assign the mortgage to the Commissioner, it shall, at any time within 30 days after the date of the notice of such election, file its application for insurance benefits and assign, in such manner as the Commissioner may require, the original credit and security instruments to the Commissioner. In addition, the following requirements shall be met:

(1) *Notice of assignment.* On the date the assignment of the mortgage is filed for record, the mortgagee shall notify the Commissioner on a form prescribed by him of such assignment, and shall also notify the FHA Assistant Commissioner-Comptroller by telegram of such recordation.

(2) *Warranty of mortgage.* The assignment shall be made without recourse or warranty, except that the mortgagee shall warrant that:

(i) No act or omission of the mortgagee has impaired the validity and priority of the mortgage.

(ii) The mortgage is prior to all mechanics' and materialmen's liens filed on record subsequent to the recording of the mortgage, regardless of whether such liens attached prior to the recording date.

(iii) The mortgage is prior to all liens and encumbrances which may have attached or defects which may have arisen subsequent to the recording of the mortgage, except such liens or other matters

as may be approved by the Commissioner.

(iv) The amount stated in the instrument of assignment is actually due under the mortgage and there are no offsets or counterclaims against such amount.

(v) The mortgagee has a good right to assign the mortgage.

(3) *Items delivered by mortgagee.* The mortgagee shall deliver to the Commissioner, within 45 days after the assignment is filed for record, the items enumerated below:

(i) An assignment of all claims of the mortgagee against the mortgagor or others arising out of the mortgage transaction.

(ii) All policies of title or other insurance or surety bonds or other guaranties, and any and all claims thereunder, including evidence satisfactory to the Commissioner that the effective date of the original title coverage has been extended to include the assignment of the mortgage to the Commissioner.

(iii) All records, ledger cards, documents, books, papers, and accounts relating to the mortgage transaction.

(iv) All property of the mortgagor held by the mortgagee or to which it is entitled (other than the cash items which are to be retained by the mortgagee) pursuant to subparagraph (4) of this paragraph.

(v) Any additional information or data which the Commissioner may require.

(4) *Disposition of cash items.* The following cash items shall either be retained by the mortgagee or delivered to the Commissioner in accordance with instructions to be issued by the Commissioner at the time the insurance claim is filed:

(i) Any balance of the mortgage loan not advanced to the mortgagor.

(ii) Any cash held by the mortgagee or its agents or to which it is entitled, including deposits made for the account of the mortgagor, and which have not been applied in reduction of the principal of the mortgage indebtedness.

(iii) All funds held by the mortgagee for the account of the mortgagor received pursuant to any other agreement.

(iv) The amount of any undrawn balance under a letter of credit used in lieu of a cash deposit.

(c) *Conveyance of title to Commissioner.* If the mortgagee elects to acquire and convey title to the Commis-

424

sioner, the following requirements shall be met:

(1) *Alternative actions by mortgagee.* At any time within a period of 30 days after the date of the notice of such election, the mortgagee shall take one of the alternative actions in subparagraph (2) or (3) of this paragraph.

(2) *Foreclosure of mortgage.* The mortgagee may elect to commence foreclosure proceedings. If the laws of the State where the property is located do not permit institution of foreclosure within such 30-day period, foreclosure shall be commenced not less than 30 days after such action can be taken. Under such proceedings, the mortgagee shall take one of the following actions:

(i) Obtain possession of the mortgaged property and the income therefrom through the voluntary surrender thereof by the mortgagor.

(ii) Institute and prosecute with reasonable diligence, proceedings for the appointment of a receiver to manage the mortgaged property and collect income therefrom.

(iii) Proceed to exercise such other rights and remedies as may be available to it for the protection and preservation of the mortgaged property and to obtain the income therefrom under the mortgage and the law of the particular jurisdiction.

(iv) With the prior approval of the Commissioner, exercise the power of sale under a deed of trust.

(3) *Acquisition of title and possession.* The mortgagee, with the approval of the Commissioner, may elect to acquire possession of, and title to, the mortgaged property by means other than foreclosure. With the prior approval of the Commissioner, title may be transferred directly to the Commissioner.

(4) *Notice of foreclosure.* The mortgagee shall give written notice to the Commissioner within 30 days after the institution of foreclosure proceedings and shall exercise reasonable diligence in prosecuting such proceedings to completion. Any developments which might delay the consummation of such proceedings shall be promptly reported to the Commissioner.

(5) *Transfer by mortgagee.* After acquiring title to and possession of the property, the mortgagee shall (within 30 days of such acquisition) transfer title and possession of the property to the Commissioner. The transfer shall be made in such manner as the Commis-

sioner may require. On the date the deed is filed for record, the mortgagee shall notify the Commissioner on a form prescribed by him of the filing of such conveyance, and shall also notify the FHA Assistant Commissioner-Comptroller by telegram of such recordation.

(6) *Filing of deed and application.* The mortgagee shall file its application for insurance benefits at the time of filing for record of the deed conveying the property to the Commissioner.

(7) *Deed covenants and documents.* The deed conveying the property to the Commissioner shall contain covenants satisfactory to the Commissioner. The original deed shall be forwarded to the Commissioner as soon as received from the recording authority. The following documents shall be forwarded with the deed:

(i) A bill of sale covering any personal property to which the mortgagee is entitled by reason of the mortgage transaction or by the acceptance of a deed in lieu of foreclosure.

(ii) An assignment of all claims of the mortgagee against the mortgagor or others arising out of the mortgage transaction and out of the foreclosure proceedings or other means by which the property was acquired.

(iii) An assignment of any claims on account of title insurance and fire or other hazard insurance, except claims which have been released with the prior approval of the Commissioner.

(8) *Title evidence.* Evidence of title, satisfactory to the Commissioner and meeting the requirements of § 207.258a shall be furnished to the Commissioner (without expense to him) within 45 days of the filing for record of the deed conveying the property to him.

(9) *Disposition of cash items.* The provisions of paragraph (b) (4) of this section, relating to the retention or delivery of cash items, shall be applicable to cases involving the conveyance of property to the Commissioner.

§ 207.258a   Title requirements.

(a) *Form of title evidence.* The title evidence submitted with a conveyance of the property to the Commissioner shall be in the form of an owner's policy of title insurance, except that, if an abstract and attorney's opinion were accepted by the Commissioner at the time of insurance, the title evidence may be in such form. The title evidence shall be effective on or

§ 207.259    Title 24—Housing and Urban Development

after the date of the recording of the conveyance to the Commissioner.

(b) *Content of title evidence.* To be satisfactory to the Commissioner, the title evidence covering the property conveyed to him shall show the same title vested in the Commissioner as was vested in the mortgagor as of the date of the mortgage was filed for record, with the exception of such liens or other matters affecting the title as may be approved by the Commissioner.

§ 207.259    Insurance benefits.

(a) *Method of payment.* Upon either an assignment of the mortgage to the Commissioner or a conveyance of the property to him in accordance with the requirements of § 207.258, payment of an insurance claim shall be made in cash, in debentures, or in a combination of both, as determined by the Commissioner at the time of payment, except that where the mortgage is insured pursuant to (1) Section 223(e) of the National Housing Act, or (2) Section 223(f) of the Act and at the time of the insurance endorsement, the mortgage met the special eligibility requirements contained in § 207.32a(k), such claim shall be paid in cash, unless the mortgagee files a written request, with the application, for payment in debentures. A claim paid in cash on a mortgage insured pursuant to Section 223(e) shall be paid from the Special Risk Insurance Fund. If the mortgagee files an application for payment in debentures on a claim on a mortgage insured pursuant to Section 223(e) or 223(f), the claim shall be paid by issuing debentures and by paying any balance in cash.

(b) *Amount of payment; assignment of mortgage.* If the mortgage is assigned to the Commissioner, the insurance benefits shall be paid in an amount determined as follows:

(1) By adding to the unpaid principal amount of the mortgage, computed as of the date of default, the following items:

(i) The amount of all payments made by the mortgagee for taxes, special assessments and water rates which are liens prior to the mortgage; for insurance on the property; and for any mortgage insurance premiums paid after default.

(ii) An allowance for reasonable payments made by the mortgagee, with the approval of the Commissioner, for the completion and preservation of the property.

(iii) An amount equivalent to the debenture interest which would have been earned on the portion of the insurance benefits paid in cash, as of the date such cash payment is made, except that when the mortgagee fails to meet any one of the applicable requirements of §§ 207.256 and 207.258 within the specified time and in a manner satisfactory to the Commissioner (or within such further time as the Commissioner may approve in writing), the interest allowance in such cash payment shall be computed only to the date on which the particular required action should have been taken or to which it was extended

(2) By deducting from the total of the items computed under subparagraph (1) of this paragraph, the following items

(i) Any amount received by the mortgagee on account of the mortgage after the date of default.

(ii) Any net income received by the mortgagee from the property covered by the mortgage after the date of default

(iii) The sum of the cash items retained by the mortgagee pursuant to § 207.258(b)(4), except the balance of the mortgage loan not advanced to the mortgagor.

(iv) An amount equivalent to 1 percent of the mortgage funds advanced to the mortgagor and not repaid as of the date of default, except that all or part of the 1 percent may be waived by the Commissioner if, at his request and in lieu of foreclosure, the mortgage is assigned to the Secretary.

(c) *Amount of payment; conveyance of property.* If the property is conveyed to the Commissioner, the insurance benefits shall be paid in an amount determined in accordance with paragraph (b) of this section, except that the item set forth in paragraph (b)(2) (iv) shall not be deducted.

(d) *Issuance of certificate of claim* In addition to the insurance benefits paid under paragraph (b) or (c) of this section, a certificate of claim shall be issued to the mortgagee.

(1) In the case of an assignment of the mortgage, the certificate shall be for an amount which the Commissioner determines to be sufficient, when added to the amount of the insurance benefits, to equal the amount the mortgagee would have received if, on the date of assignment to the Commissioner, the

426

Chap. II—Office of Assistant Secretary for Housing                    § 207.260

mortgagor had paid in full all obligations under the mortgage. Where a conveyance is involved, there shall also be included in the certificate an allowance in a reasonable amount for any necessary expenses incurred by the mortgagee in connection with the foreclosure proceedings or the acquisition of the mortgaged property otherwise and in connection with the conveyance of the property to the Commissioner.

(2) The certificate of claim shall provide for an uncompounded annual interest increment of 3 percent to begin as of the date of either assignment or conveyance.

(e) *Issuance of debentures.* Where debentures are issued, they shall meet the following requirements:

(1) Be issued as of the date of default.

(2) Be registered as to principal and interest.

(3) At the option of the Commissioner and with the approval of the Secretary of the Treasury, be redeemable at par plus accrued interest on any semiannual interest payment date on 3 months' notice of redemption given in such manner as the Commissioner shall prescribe. The debenture interest on the debentures called for redemption shall cease on the semiannual interest payment date designated in the call notice. The Commissioner may include with the notice of redemption an offer to purchase the debentures at par plus accrued interest at any time during the period between the notice of redemption and the redemption date. If the debentures are purchased by the Commissioner after such call and prior to the named redemption date, the debenture interest shall cease on the date of purchase.

(4) Mature 20 years from the date thereof.

(5) Be issued in multiples of $50, and any differences not in excess of $50 between the amount of insurance benefits to which the mortgagee is entitled hereunder and the aggregate face amount of the debentures issued, shall be paid in cash by the Commissioner to the mortgagee.

(6) Bear interest from the date of issue, payable semiannually on the first day of January and first day of July of each year at the rate in effect as of the date the commitment was issued, or as of the date of initial insurance endorsement of the mortgage, whichever rate is

the higher. The following interest rates are effective for the dates listed:

| Effective rate | On or after— | Prior to— |
|---|---|---|
| Percent: | | |
| 6¾ | Jan. 1, 1971 | July 1, 1971 |
| 5¾ | July 1, 1971 | Jan. 1, 1972 |
| 5½ | Jan. 1, 1972 | July 1, 1972 |
| 5⅝ | July 1, 1972 | Jan. 1, 1973 |
| 5¼ | Jan. 1, 1973 | July 1, 1973 |
| 6 | July 1, 1973 | Jan. 1, 1974 |
| 6¼ | Jan. 1, 1974 | July 1, 1974 |
| 6¾ | July 1, 1974 | Jan. 1, 1975 |
| 7 | July 1, 1975 | Jan. 1, 1976 |
| 7¼ | Jan. 1, 1976 | July 1, 1976 |
| 7 | July 1, 1976 | Jan. 1, 1977 |
| 6⅝ | Jan. 1, 1977 | |

(7) Debentures representing the portion of the claim applicable to an operating loss loan shall bear interest at the rate in effect as of the date the commitment to insure such loan was issued, or as of the date of endorsement for insurance of such loan, whichever rate is the higher, although debentures representing the portion of the claim applicable to the original mortgage may bear interest at a different rate.

[36 FR 24537, Dec. 22, 1971, as amended at 41 FR 45829, Oct. 18, 1976; 42 FR 17452, Apr. 1, 1977]

§ 207.259a   Waiver of title objection; mortgages formerly Commissioner-held.

If the Commissioner sells a mortgage and such mortgage is later reassigned to him in exchange for debentures or the property covered by such mortgage is later conveyed to him in exchange for debentures, the Commissioner will not object to title by reason of any lien or other adverse interest that was senior to the mortgage on the date of the original sale of such mortgage by the Commissioner.

§ 207.260   Protection of mortgage security.

(a) *Annual inspection of property by mortgagee.* As long as the mortgage is insured by the Commissioner, the mortgagee shall ascertain the general physical condition of the mortgaged property in each calendar year commencing with the calendar year following completion of the project. The mortgagee shall furnish the Commissioner and the mortgagor with a copy of its inspection report, which shall contain the mortgagee's recommendations for any necessary action.

(b) *Damage to property by unreasonable use, abuse, or neglect.* If a claim for

427

§ 207.261    Title 24—Housing and Urban Development

mortgage insurance benefits is filed, the Commissioner will accept an assignment of the mortgage or conveyance of the property even though the buildings or improvements thereon have been subjected to permanent or substantial damage through unreasonable use, abuse or neglect. The mortgagee shall not be held responsible for such damage and deductions therefor will not be made from mortgage insurance benefits.

(c) *Insurance of property against fire and other hazards.* The mortgaged property shall be insured against fire, flood, and other hazards as provided in the mortgage and as stipulated by the Federal Housing Commissioner. The mortgagee shall obtain such coverage in the event the mortgagor fails to do so. If the mortgagee fails to pay any premiums necessary to keep the mortgaged premises so insured, the contract of mortgage insurance may be terminated at the election of the Commissioner.

(d) *Effect of failure to provide insurance; cancellation of insurance.* If the mortgage is assigned to the Commissioner or the property is conveyed to the Commissioner and at the time of such assignment or conveyance the property has been damaged by fire or other hazards and loss has been sustained because of failure to keep the property insured as provided in the mortgage, the amount of such loss may be deducted from the insurance benefits paid by the Commissioner, unless the following conditions are met:

(1) The property shall have been covered by insurance against fire and other hazards at the time the mortgage was insured.

(2) Such insurance shall have been later canceled or renewal shall have been refused by the insuring company.

(3) The mortgagee shall have notified the Commissioner within 30 days (or within such further time as the Commissioner may approve) of the cancellation of the insurance or of the refusal of the insuring company to renew the insurance. Such notification shall have been accompanied by a certification that the mortgagee's diligent efforts to obtain insurance coverage against fire and other hazards at reasonably competitive rates were unsuccessful and that it would continue its efforts to obtain adequate insurance coverage at competitive rates.

(e) *Application of insurance proceeds.* (1) In the event a loss has occurred to the mortgaged property under any policy of fire or other hazard insurance and the mortgagee has received the proceeds therefrom, it shall not exercise its option under the mortgage to use the proceeds of such insurance for the repairing, replacing, or rebuilding of the premises, or apply them to the mortgage indebtedness, or make other disposition of such proceeds, without the prior written approval of the Commissioner.

(2) If the proceeds are applied to the mortgage with such prior written approval and result in the payment in full of the entire mortgage indebtedness, the contract of mortgage insurance made with the Commissioner shall thereupon terminate.

(3) If the Commissioner shall fail to give his approval to the use or application of such funds for either of said purposes within 30 days after written request by the mortgagee, the mortgagee may use or apply such funds for any of the purposes specified in the mortgage without the approval of the Commissioner [36 FR 24537, Dec. 22, 1971, as amended at 39 FR 26023, July 16, 1974]

ASSIGNMENTS

§ 207.261    Assignment of insured mortgages.

(a) *In general.* An approved mortgagee may assign, transfer or pledge an insured mortgage or a partial interest in an insured mortgage by way of a participation or other arrangement, in accordance with the terms and conditions prescribed in this section.

(b) *Bonds.* Bonds or other obligations issued in connection with an insured mortgage executed in the form of an indenture of trust may be transferred as provided in the trust indenture and the provisions of paragraph (g) of this section shall not be applicable to these transfers.

(c) *Transfers prior to full disbursement.* Transfers or pledges of the insured loan may be made prior to full disbursement only with the prior written approval of the Commissioner.

(d) *Transfers after full disbursement.* Transfers after full disbursement may be made only to a transferee approved by the Commissioner. Upon assumption by the transferee of all obligations under

428

the contract of mortgage insurance, the transferor shall be released from its obligations under such contract. The transfer shall be reported to the Commissioner on a form satisfactory to the Commissioner.

(e) *Transfer of partial interest under participation agreement.* A partial interest in an insured mortgage may be transferred without obtaining the approval of the Commissioner under a participation agreement or arrangement if the following conditions are met:

(1) The insured mortgage shall be held by an approved mortgagee subject to the inspection and supervision of a governmental agency authorized by law to make periodic examination of its books and accounts, and which shall for the purposes of this section be hereinafter referred to as the "principal" mortgagee;

(2) The "principal" mortgagee shall at all times retain at least a ten percent beneficial interest in the insured mortgage up to the time of final endorsement, and at least a five percent beneficial interest thereafter;

(3) A participation or partial interest in an insured mortgage shall be issued to and held only by a holder meeting one of the following qualifications:

(i) A mortgagee approved by the Commissioner;

(ii) A pension or retirement fund or a profit-sharing plan maintained and administered by a corporation or by a governmental agency or by a trustee or trustees, which the "principal" mortgagee determines has lawful authority to acquire a partial interest in an insured mortgage under the conditions set forth in this paragraph;

(iii) A charitable or nonprofit organization.

(4) The participation agreement or arrangement, in addition to other provisions as may be agreed upon between the participants, shall provide that the "principal" mortgagee shall remain the mortgagee of record under the contract of mortgage insurance; and that the Commissioner shall have no obligation to recognize or deal with any other party except the mortgagee of record with respect to the rights, benefits and obligations of the mortgagee under the contract of insurance.

(f) *Notice not required.* No notice of any sale or transfer of a participating or partial interest shall be required, unless the insured mortgage is transferred in its entirety to a new "principal" mortgagee on the public records.

(g) *Unauthorized transfer, pledge or assignment.* The contract of insurance may, at the option of the Commissioner and under such conditions as he may prescribe, be terminated in the event of a transfer, pledge or assignment of an insured mortgage or of a partial or participating interest therein, which does not meet the requirements contained in this section.

EXTENSION OF TIME

§ 207.261a    Actions to be taken by mortgagee.

With respect to any action required of the mortgagee within a period of time prescribed by this subpart, the Commissioner may extend such period.

RIGHTS IN HOUSING FUND

§ 207.262    No vested right in fund.

Neither the mortgagee nor the mortgagor shall have any vested or other right in the General Insurance Fund.

AMENDMENTS

§ 207.499    Effect of amendments.

The regulations in this subpart may be amended by the Commissioner at any time and from time to time, in whole or in part, but such amendment shall not adversely affect the interests of a mortgagee or lender under the contract of insurance on any mortgage or loan already insured and shall not adversely affect the interests of a mortgagee or lender on any mortgage or loan to be insured on which the Commissioner has made a commitment to insure.

## PART 209—INDIVIDUAL HOMES: WAR HOUSING MORTGAGE INSURANCE [SEC. 603]

Subpart A—[Reserved]

Subpart B—Contract Rights and Obligations

Sec.
209.251    Incorporation by reference.
209.255    Due date of initial MIP.
209.260    Adjustment of initial MIP.
209.265    Amount of annual MIP.

429

# EXHIBIT B

FHA FORM NO. 4157-A
(CORPORATED)
Revised March 1955

# MORTGAGE NOTE

$17,629,100.00

New York , New York

October 13 , 1977

FOR VALUE RECEIVED, the undersigned, St. Marks Place Housing Company, Inc., promises to pay to New York State Housing Finance Agency, a public benefit a corporation organized and existing under the laws of New York, or order, hereinafter designated as the Mortgagee, the principal sum of seventeen million, six hundred twenty-nine thousand, one hundred ——— Dollars ($ 17,629,100.00 ) with interest from date at the rate of eight and one half per centum ( 8.5 %) per annum on the unpaid balance until paid. The said principal and interest shall be payable in monthly installments as follows:

        See "Attachment A", Paragraph 1
        incorporated herein by reference
        and made a part hereof

Both principal and interest under this Note, as well as the additional payments set forth in the Mortgage of even date herewith securing this Note, shall be payable at the office of New York State Housing Finance Agency at          ⁿ 1250 Broadway, New York, New York  10001 or such other place as the holder may designate in writing.

Privilege is reserved to pay the debt in whole or in an amount equal to one or more monthly payments on principal next due, on the first day of any month prior to maturity upon at least thirty (30) days' prior written notice to the holder. If this debt is paid in full prior to maturity and while insured under the National Housing Act, all parties liable for payment of this debt hereby agree to be jointly and severally bound to pay to the holder hereof any adjusted premium charge required by the applicable Regulations.  See "Attachment A", Paragraph 2 incorporated herein by reference and made a part hereof.

Notwithstanding any provision herein for a prepayment charge, such charge shall be applicable only to the amount of prepayment in any one calendar year which is in excess of fifteen per centum (15%) of the original principal sum of this Note.

The whole of the principal sum or any part thereof, and of any other sums of money secured by the Mortgage given to secure this Note, shall, forthwith, or thereafter, at the option of the Mortgagee, become due and payable if default be made in the payment of any installment under this Note, and if such default is not made good prior to the due date of the next such installment or upon the happening of any default which, by the terms of the Mortgage given to secure this Note, shall entitle the Mortgagee to declare the same, or any part thereof, to be due and payable; all the covenants, agreements, terms, and conditions of said Mortgage ~~and of the Building Loan Agreement~~ are hereby incorporated herein by reference to the same extent and effect as if fully set forth and made a part of this Note; and the undersigned hereby covenants to perform all such covenants and agreements. Failure to exercise this option shall not constitute a waiver of the right to exercise the same in the event of any subsequent default.  In the event of default in the payment of this Note, and if the same is collected by an attorney at law, the undersigned hereby agree(s) to pay all costs of collection, including a reasonable attorney's fee.

**Subject to the prior approval of the Secretary of Housing and Urban Development

No default shall exist by reason of nonpayment of any required payment of principal so long as the amount of optional additional prepayments of principal already made pursuant to the privilege of prepayment set forth in this Note equals or exceeds the amount of such required installment of principal.

All parties to this Note, whether principal, surety, guarantor, or endorser, hereby waive presentment for payment, demand, protest, notice of protest, and notice of dishonor.

See Attachment "A", Paragraph 3
Signed and sealed the day and year first above written.

ST. MARKS PLACE HOUSING COMPANY, INC.

ATTEST: _____    By _____

_____    By _____

THIS IS TO CERTIFY that this is the Note described in, and secured by, Mortgage of even date herewith, and in the same principal amount as herein stated, on property located at 165-185 St. Marks Place in the City of New York, Borough of Richmond , County of Richmond State of New York.

_____
Notary Public

_____
Notary Public . . . of New York
No. 41-3423001
Qualified in Queens County
Commission Expires March 30, 1979

Pay to the Order of Metropolitan
Savings Bank      without recourse
this  13 day of October ,1977

NEW YORK STATE HOUSING FINANCE AGENCY

BY _____

Assistant Director

---

STATE OF NEW YORK

Loan No. 012-11024 NFC-CON-X

**Mortgage Note**

ST. MARKS PLACE HOUSING COMPANY, INC.
TO
NEW YORK STATE HOUSING FINANCE AGENCY

No. 012-11024 / PURSUANT to 223(f)
Insured under § 207 of the National Housing Act and Regulations thereunder of the Federal Housing Commissioner

In effect on December 20, 1976

To the extent of advances approved by the Commissioner

FEDERAL HOUSING COMMISSIONER

By _____
(Authorized Agent)

Date _____

A total loan of $17,509,100.00 has been approved for insurance thereunder by the Commissioner

FEDERAL HOUSING COMMISSIONER

By _____
(Authorized Agent)

Date October 13, 1977

Reference is made to the Act and to the Regulations thereunder governing assignments of the insurance protection on this note.
Fed-Omaha, D.C.

1st104-P Rev.7/66

ATTACHMENT A

Attached to and being a part of the Mortgage Note executed by
St. Marks Place Housing Company, Inc.,
_____(Mortgagor) dated
October    13    1977   to New York State Housing
Finance Agency   in the principal sum of seventeen million, six
hundred twenty-nine thousand, one hundred and no/100 ($17,629,100.00)
dollars.

Paragraph 1

Interest only payable from the date hereof on the first day of
November   , 1977.  Commencing on the first day of
December   , 1977, installments of interest and principal
shall be paid in the sum of one hundred twenty-nine thousand, two
hundred thirty-seven and 90/100 _____ Dollars
($129,237.90   ), such payments to continue thereafter monthly
on the first day of each succeeding month until the entire indebt-
edness has been paid.  In any event the balance of the principal,
if any, remaining unpaid, plus accrued interest, if any, shall be
due and payable on November 1, 2017.           The installments
of interest and principal shall be applied first to the interest
at the rate of eight and one-half per centum (8 1/2%) per annum
upon the principal sum or so much thereof as shall from time to
time remain unpaid, and the balance thereof shall be applied
on account of principal.  In the event the maker hereof shall
fail to make any monthly payment due to the holder hereof
within fifteen (15) days after the due date thereof the holder
hereof may, at its option, impose a late charge, in addition to
any other sums due and payable upon the maker hereof of Two Cents
($.02) for each One Dollar ($1.00) of interest and/or principal
which is more than fifteen days in arrears.

The maker hereof assumes no personal liability for the payment
of the principal of or the interest on this Note except as set
out in the Mortgage securing this Note.

PROVIDED, if mortgagor fails to achieve certain rental increases in
the property by   April 13 , 1979           and a prepayment is
made on the outstanding principal balance of the debt in an amount
to be determined by the Secretary of Housing and Urban Development
(which amount shall in no event exceed the sum of $2,557,700.00 )
then the monthly payment of principal and interest shall be adjusted
to equal an amount determined by

    (1)  Substracting from the original principal debt of
         $17,629,100.00   :

         (a)  The amount of any payments to principal; and

         (b)  The amount of the prepayment; and

    (2)  Multiplying the amount remaining after completion of (1)
         above by a factor to be determined by the Secretary of
         Housing and Urban Development which will amortize the then
         remaining principal balance of the debt over the remainder
         of the original term of the Loan.

The revised monthly payment of principal and interest shall be effective
the first day of the first month following the month in which the pre-
payment is made.

AND FURTHER PROVIDED, the maturity date, the rate of interest and other
terms of this Mortgage Note shall not be altered or adjusted by reason
of the prepayment.

Paragraph 2

Provided, that additional prepayment (beyond such 15% of such original sum in any one calendar year) may be made on any interest payment date upon 30 days' prior written notice to the holder hereof; And Provided Further, That, in the event of prepayment of principal during any one calendar year in any amount in excess of fifteen percent (15%) of the original principal amount of the Note, all parties liable for payment thereof hereby agree to be jointly and severally bound to pay to the holder hereof for its own account a penalty or charge equal to three percent (3%) of the amount of such excess less 1/8 of 1 percent for each 12 month period which has elapsed since the Date of this Note; Provided, however, no additional charge shall be collected by the holder hereof for any partial prepayment of principal which is made by the maker or on its behalf pursuant to a requirement of the Federal Housing Commissioner.

Paragraph 3

This Mortgage Note is evidence of a portion of an indebtedness in an original and prior note in the amount of $20,990,000.00 dated      *      which prior note was modified, recast and divided into this senior note, in the amount of $17,629,100.00        (insured by the Secretary), and a junior note (of even date herewith), in the amount of $3,360,900.00        The recasting and division into the senior and junior indebtedness was accomplished pursuant to a certain Modification and Severance Agreement of even date herewith.

* Three Notes dated 1/30/74 ($19,715,000), 6/11/76 ($975,000) 10/13/77 ($300,000) respectively.

WITNESS:

ST. MARKS PLACE HOUSING COMPANY INC.

By: _____

By: _____

# EXHIBIT C



U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, D.C. 20410-0500

OFFICE OF GENERAL COUNSEL

October 11, 2007

MEMORANDUM FOR:    Beverly J. Miller, Director,
                   Office of Asset Management, HTG

FROM:              Millicent B. Potts, Assistant General Counsel
                   Multifamily Mortgage Division, CIM

SUBJECT:           Castleton Park Apartments
                   FHA Project No. 012-11024
                   Staten Island, NY

This legal opinion is a supplement to the previous Castleton Park (the Project) legal opinion distributed to your office on June 12, 2007, and will provide further explanation as to why our office maintains the position that Section 250 of the National Housing Act (the Act) and Section 219 of the Departments of Veteran Affairs, Housing and Urban Development and Independent Agencies Appropriations Act of 1999 (Section 219) are not applicable to the prepayment restriction found in the HUD-insured mortgage note. As you know, the Project is secured by a first mortgage insured under Section 207 pursuant to Section 223(f) (HUD Senior Mortgage) of the Act and a second non-insured mortgage (Subordinate Mortgage) pursuant to Section 236 of the Act.

As we stated in our June 12 memorandum, since there were no HUD statutes, regulations or administrative requirements which required that a 40-year prepayment restriction be placed in the HUD Senior Mortgage, we think that the prepayment restriction was a result of tax-exempt bond financing associated with this loan where the prepayment restriction was specifically negotiated and contractually agreed to by the parties to the note.

When we receive prepayment requests for OGC review, we first look at the type of mortgage insurance program involved (e.g., Section 236, Section 221(d) (3), (d) (4), or (d) (5)), and then we review the prepayment restriction in the note to determine if it is a valid prepayment restriction (one required by statute, regulation or HUD administrative requirement). If that restriction is inconsistent with the statute, regulations or administrative requirements which were in effect at the time the note was endorsed for mortgage insurance, we consider the prepayment restriction void as it relates to HUD. The parties in this case did not have the authority to make changes to the HUD note that were inconsistent with the regulations in effect at the time, nor did they have the authority to go beyond what the regulations set forth. In other words, the parties could not impose a HUD requirement for consent to a prepayment of the mortgage when HUD's consent to prepay was not required by the statutes, regulations, or administrative requirements in effect at the time the note was endorsed for mortgage insurance. HUD only imposed prepayment

2

restrictions in HUD-insured mortgage notes for those projects receiving a subsidy authorized by the Act. These subsidies, set forth in Housing Notice H-06-11, are as follows:

(1) A property with a mortgage insured under Section 236 or 221(d)(3) BMIR with a non-profit owner.

(2) A property with a mortgage insured under Section 236 or 221(d)(3) BMIR with a limited dividend owner that is within 20 years from final endorsement.

(3) A property with a mortgage insured under Section 236 or 221(d)(3) BMIR, that was transferred from a non-profit owner to a limited dividend owner and the mortgage note was not amended or modified.

(4) A property with a Rent Supplement Contract.

(5) A property with a Flexible Subsidy loan, that contained a 40-year restriction against prepayment without HUD approval, and where the Financial Assistance Contract contains paragraph 17 regarding preserving affordability of the project until the end of original mortgage term.

The owner of the Project is a limited dividend owner. Under the Section 207 regulations in effect at the time the note was endorsed for insurance, an owner can prepay the mortgage after giving a thirty (30) day notice to the mortgagee (24 CFR 207.14). The Project is currently receiving Section 236 Interest Reduction Payments (IRP). Under the Section 236 regulations in effect at the time of endorsement, the mortgagor, as a limited dividend entity, would be able to prepay, without HUD approval, anytime after twenty (20) years from the date of final endorsement of the note. Additionally, the regulation which provided the refinancing authority for this transaction, 24 CFR 207.32(a)(k), did not contain a prepayment restriction requirement. Furthermore, there were no statutes at the time which required that a prepayment lock-out be placed in the HUD Senior Mortgage note. In view of the foregoing, it is our view that the prepayment restriction was improperly placed in the HUD Senior Mortgage note (although it was a term contractually agreed to by the mortgagor and the mortgagee), and therefore it is void as it relates to HUD. Given OGC's long-standing legal view that prepayment lock-outs must be consistent with the regulations in effect at the time of final endorsement of the note, our legal position is that Section 250 of the Act would not apply since the prepayment lock-out was inconsistent with HUD legal requirements.

Given the unique nature of this transaction, the parties may request a comfort letter from HUD indicating that prior HUD approval is not legally required to prepay the HUD Senior Mortgage. As a condition to granting such request, Housing may administratively impose conditions that must be satisfied by the owner in order to receive the comfort letter. For example, Housing may choose to have the owner execute a Use Agreement that requires the project to maintain the same affordability and rental restrictions that were in place before the prepayment until at least the date the HUD Senior Mortgage would have matured had it not been prepaid.

As indicated in our June 12 legal opinion, the Subordinate Mortgage cannot be prepaid without the prior written approval of the Secretary until after the HUD Release Date occurs (i.e., the HUD Senior Mortgage is prepaid or until it is no longer held or insured by the Secretary). Once the HUD Release Date occurs, the Subordinate Mortgage may be prepaid without

3

Secretary approval as long as it meets the requirements set forth in Section 219. However, if a Use Agreement is placed on the Project as a result of Housing's administrative conditions to providing a comfort letter in connection with the prepayment of the HUD Senior Mortgage, even though the tenants would be eligible to receive enhanced vouchers as a result of a prepayment of the Junior Mortgage, it is unclear what benefit enhanced vouchers would provide the tenants since under the Use Agreement rent increases would be restricted.

## CONCLUSION

In view of the foregoing, we conclude that (1) there was no legal basis to place the prepayment restriction in the HUD Senior Mortgage, and we, therefore, view it as void as it relates to HUD; (2) Section 250 of the Act would not apply to this prepayment restriction because Section 250 only applies to HUD-imposed prepayment lock-outs which were required by HUD; and (3) Housing, notwithstanding items (1) and (2) above, can make an administrative determination to provide a comfort letter to the parties in connection with the prepayment of the HUD Senior Mortgage only if the owner agrees to certain conditions, such as execution of the Use Agreement, before the prepayment occurs.

This opinion does not provide any legal advice with respect to the payment of interest reduction payments on the Castleton Park mortgages

Please contact Kelly Gil at ext. 5261 if you have any questions or desire further assistance.

# EXHIBIT D



**TOPICS**
· · · · · · · · · · · · ·
Latest News
Press Release
Archive
Special Reports
Photo Downloads
Schumer Around NY

| About Chuck | Senate Floor | Press Room | Services for New Yorkers | Kids' Page | Contact | Home |

## Latest News

📰 Printer-friendly Version

FOR IMMEDIATE RELEASE: December 20, 2007

**SCHUMER SCORES VICTORY IN BID TO SAVE MIDDLE-CLASS HOUSING AT CASTLETON PARK, CONVINCES HUD TO TAKE FIRST STEPS TO ENSURE AFFORDABILITY OF BUILDING**

*Following Numerous Letters, Calls and Meetings Between Schumer and HUD, HUD Agrees to Apply Section 250 of Housing Law to Castleton Park*

*Under Section 250, All Rent Changes Must Be Approved by HUD Within Affordability Guidelines, Ownerhsip Changes Must be Agreed to by HUD, and Owners Must Commit to Building Improvements*

*Schumer: This Marks a Big Win for Middle-Class Hou*

Following a months-long fight to ensure middle-class housing affordability continues on Staten Island, U.S. Senator Charles E. Schumer today announced that he has convinced the U.S. Department of Housing and Urban Development (HUD) to apply Section 250 of the National Housing Act to Castleton Park, ensuring the continued affordability of the development. Castleton Park is a 454-unit complex in St. George and one of only two Mitchell-Lama developments on Staten Island. Under Section 250, the current owner must set aside funding for rehabilitation and repairs of the buildings, any rent increases must be approved by HUD within affordability guidelines and all potential buyers of the complex must be approved by HUD. HUD committed to applying the standard following a meeting with Schumer in October.

"This is a very positive development that will preserve affordability for the families and seniors in Castleton Park. HUD has been a welcome partner in protecting much of the vanishing middle-class housing in New York, and I am proud to announce that HUD has agreed to continue that work on Staten Island by applying tenant protections at Castleton Park," Schumer said. "I will continue to work with HUD to ensure that Castleton Park remains affordable for the next generation of Staten Island's hard-working, middle-class families to maintain their way of life."

Since it was constructed in 1974, Castleton Park has relied on a variety of government subsidies to ensure the development's affordability and upkeep, including a HUD-insured mortgage. Under Section 250 of the National Housing Act, HUD generally can only approve the prepayment of a HUD-insured mortgage if the agency determines that the housing is no longer needed as affordable in that community. However, HUD may also allow the prepayment of a mortgage if there is a need for capital rehabilitation at a complex.

Since Castleton Park is in need of repair and rehabilitation, HUD may approve a prepayment, but due to the application of Section 250, several tenant protections will also be applied. First, any rent increases must be approved by HUD and fall within affordability guidelines. Second, any potential buyer must be approved by HUD, allowing tenants and HUD the opportunity to examine the record of potential buyers and to determine if they have and will maintain the affordability and livability of the complex. Finally, any owner under Section 250 must either escrow or take out a line of credit for necessary repairs of rehabilitation of units. For Castleton Park, an owner would be required to put $15,000 per unit into repairs, or $6.8 million for the complex.

"Because of the impressive activism of Castleton Park residents, HUD has laid out a blanket of protections that will preserve affordability and provide much-needed peace of mind in this holiday season to all who live there," said Schumer.

Under Section 250, any prepayment application will have to be considered for 150 days, giving Schumer and the tenants an opportunity to work with HUD to determine the affordability guidelines for any potential rent increases. While HUD maintains that rent increases could be approved at a monthly rate of 30% of 80% of area median income, Schumer will continue to push that standards be set at 30% of 60% of area median income.

Schumer will also use the time to work with HUD to determine the suitability of the proposed buyer, Larry Gluck of Stellar Management. While Mr. Gluck had already submitted papers for prepayment, Schumer and the tenants are concerned at his troubling record running other affordable housing buildings. During Mr. Gluck's tenure as Castleton's building manager since 2006, the building has failed its physical inspection for the first time in years, and just this month, tenants received a notice that the gas bill was not paid, a failure that creates needless dread during the winter season. Mr. Gluck is also reported to have numerous outstanding code violations on the Mitchell-Lama buildings that he has purchased in the last several years.

Schumer has been a leader in the fight to save Castleton Park beginning in April when he joined tenants and activists to announce that he would be urging HUD to reject any buyouts that would threaten the affordability of Castleton Park. Since that time, Schumer has written numerous letters, met with senior HUD officials and spoken with HUD Secretary Alphonso Jackson to urge HUD to maintain the affordable units on Staten Island, which has suffered from a housing crunch due to the population boom and rising real estate prices.

#      #      #

# EXHIBIT E

[Search] [Prev List] [Doc List] [Next List] [First Doc] [Prev Doc] [Curr Doc] [Next Doc] [Last Doc]
[Bottom] [Next Hit] [Help] [Text Only]

*Preservation*

*Directive Number:* [Prev Hit][Next Hit]CIM-0111

Index: 3.600
Subject: Preservation

                                        May 1, 1995

Mr. Richard M. Price
Peabody & Brown
1255 23rd Street, N.W.
Washington, DC 20037

Dear Mr. Price:

        Your letter to Michael Flores of the Honolulu, Hawaii Office
of the Department of Housing and Urban Development ("HUD") dated
January 27, 1995 regarding Maunakea Tower has been referred to
our office for reply.

        Your letter concerns the eligibility of the above project to
participate in the preservation program under the Low-Income
Housing Preservation and Resident Homeownership Act of 1990
("LIHPRHA"), 12 U.S.C. 4101 note, or, in the alternative, the
eligibility of the project owner to prepay the mortgage. For the
reasons set forth below, we have concluded that the project is
not eligible for participation under LIHPRHA. Furthermore, we
have concluded that the project owner may not prepay its mortgage
at this time. The project mortgage will, however, become
eligible for prepayment without the Commissioner's consent on
November 25, 1996 pursuant to the HUD regulations in effect on
the date the mortgage note was initially endorsed for insurance.

        The facts, as understood by our office, are as follows. The
project mortgage was insured under Section 221(d)(3) of the
National Housing Act with a limited dividend mortgagor. The
mortgage note received initial endorsement for insurance on
October 10, 1974 and was finally endorsed on November 24, 1976.
The project is receiving assistance under Section 8 of the United
States Housing Act of 1937 ("Housing Act"), 42 U.S.C. 1437f, but
not as a result of a conversion from rent supplement assistance
under Section 101 of the Housing and Urban Development Act of
1965 ("HUD Act"), 12 U.S.C. 1701s. The mortgage note contains a
prepayment prohibition for the full term of the mortgage.

        A project, to be eligible for participation under LIHPRHA,
must meet the eligibility requirements of Section 229 of LIHPRHA.
The implementing regulations which govern LIHPRHA eligibility are
found at 24 CFR Part 248. Pursuant to LIHPRHA, the
determination of "eligible low-income housing" is a two-part
process. LIHPRHA defines "eligible low-income housing" as:

"any housing financed by a loan or mortgage-
     (A) that is-
          (i) insured or held by the Secretary under
     section 221(d)(3) of the National Housing Act and
     receiving loan management assistance under
     section 8 of the United States Housing Act of 1937
     due to a conversion from section 101 of the
     Housing and Urban Development Act of 1965;
          (ii) insured or held by the Secretary and
     bears interest at a rate determined under the
     proviso of section 221(d)(5) of the National
     Housing Act;
          (iii) insured, assisted, or held by the
     Secretary or a State or State agency under
     section 236 of the National Housing Act; or
          (iv) held by the Secretary and formerly
     insured under a program referred to in clause (i),
     (ii), or (iii); and
     (B) that, under regulation or contract in effect
     before February 5, 1988, is or will within 24 months
     become eligible for prepayment without prior approval
     of the Secretary."    LIHPRHA section 229(1).

     While the project meets the second part of the eligibility
test of Section 229(1)(B), it does not meet the first part under
Section 229(1)(A)(i).  The project mortgage is receiving
assistance under Section 8 of the Housing Act, but not due to a
conversion from assistance under Section 101 of the HUD Act as
required by the statute.  Therefore, the project is not eligible
for assistance under LIHPRHA.

     The HUD regulations that govern the mortgage insurance
contract for the project are those which were in effect on the
date the mortgage note was initially endorsed for insurance,
October 10, 1974.  The regulations which govern mortgages
insured under Section 221(d)(3) are found at 24 CFR Part 221.
Prepayment privileges are contained at 24 CFR section 221.524.
Section 221.524(a) provides in relevant part that a mortgage may
be prepaid without the Commissioner's prior consent:

     "(ii)  Where the mortgagor is a limited distribution
     type, which is not receiving payments from the
     Commissioner under a rent supplement contract executed
     pursuant to the provisions of sections 5.1 et seq. of
     this title, and where the prepayment occurs after the
     expiration of 20 years from the date of final
     endorsement of the mortgage."   24 CFR
     section 221.524(a)(1)(ii) (1974) (emphasis added).

The above regulatory section requires that the mortgagor be a
limited distribution type, that the project not be receiving rent
supplement assistance, and that 20 years have elapsed since the
mortgage note was finally endorsed for insurance before the
mortgage is prepaid.  The project owner is a "limited
distribution type."  Moreover, the project is not receiving rent
supplement assistance.  The mortgage note, however, was not
finally endorsed until November 24, 1976, thus the 20-year time
period from the date of final endorsement will not expire until
November 24, 1996.  Therefore, the project mortgage is not yet

eligible for prepayment without HUD's consent pursuant to
Section 221.524(a). It will, however, become eligible for
prepayment without HUD's prior consent on November 25, 1996.

     The prepayment prohibition in the note does not change the
result of the above analysis. In this case the governing
regulations, 24 CFR Part 221, and the mortgage note language are
in direct conflict. You are correct that in such cases the
regulations supersede contrary language in the note. The
preamble and interim rules for LIHPRHA reflect the HUD policy
that where there is a conflict between HUD regulations and
mortgage note language, the regulations will govern.
Furthermore, footnote 4 above reflects that the endorsement panel
on the mortgage note provides that the regulations in effect on
October 10, 1974 govern the contract of mortgage insurance. This
position was expressed in the context of LIHPRHA at 56 Fed. Reg.
20262, 20267 (May 2, 1991) as follows:

        "Likewise, if the applicable program regulations at
        section 221.524 or section 236.30 allow prepayment at
        the expiration of 20 years after final endorsement, but
        the mortgage note prohibits prepayment without HUD's
        consent for the full term of the mortgage, HUD would
        construe the regulation as superseding the prepayment
        prohibition in the mortgage note."

Therefore, despite the language in the note prohibiting
prepayment, the project mortgage will become eligible for
prepayment without prior HUD consent on November 25, 1996, which
is after 20 years from the date of final endorsement,
November 24, 1976.

     In view of the foregoing, we conclude that the project is
not eligible for participation under LIHPRHA because the project
is not receiving Section 8 assistance due to a conversion from
rent supplement assistance as required by the statute. We also
conclude that the project mortgage is not eligible for prepayment
without HUD's consent, but will become eligible under the
applicable regulations on November 25, 1996, despite language in
the mortgage note prohibiting prepayment.

     I hope this letter has resolved your questions in this
matter. If you have any further questions, please contact
Athena Katcheves at (202) 708-3667.

                          Sincerely,

                          /s/David R. Cooper for

                          John J. Daly
                          Associate General Counsel
                          Office of Insured Housing

---

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ST. MARKS PLACE HOUSING COMPANY, INC.; ST. MARKS PLACE ASSOCIATES; STELLAR CP LP; and CASTLETON GP LLC, | : : : : | |
| Plaintiffs, | : : | |
| - v. - | : : | |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; and ALPHONSO JACKSON, AS SECRETARY OF THE UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | : : : : : : | Case No. 08-cv-0193/RBW |
| Defendants. | : : : | |

## [PROPOSED] ORDER

UPON CONSIDERATION of Defendants' motion to dismiss, the opposition thereto, the pleadings and memoranda submitted by the parties, and all supporting papers:

IT IS HEREBY ORDERED that the motion is DENIED.

Dated: _____, 2008

_____
Hon. Reggie B. Walton
United States District Judge